**MEDINOL LTD., Plaintiff,**

v.

**BOSTON SCIENTIFIC CORP., et al., Defendants.**

**No. 01 Civ. 2881(AKH).**

United States District Court, S.D. New York.

Dec. 2, 2004.

580

Elizabeth L. Grayer, Keith Richard Hummel, Rory O. Millson, Cravath, Swaine & Moore, New York, NY, for Medinol, Ltd.

Keith Richard Hummel, Rory O. Millson, Cravath, Swaine & Moore, New York, NY, for Nasr Salman, for Judith Richter, Jacob R. Richter.

Johanna M. Toth, Edwards & Angell, LLP (NJ), Short Hills, NJ, Peter J. MacDonald, Richard J. Innis, Hale & Dorr, L.L.P., New York, NY, for Boston Scientific Corp.

John P. Cooney, Jr., New York, NY, Robert B. Fiske, Jr., Davis Polk & Wardwell, New York, NY, for Peter M. Nicholas.

Jeffrey J. Chapman, Richard H. Klapper, Samuel W. Seymour, Sullivan & Cromwell, L.L.P., New York, NY, for Lawrence C. Best.

### OPINION AND ORDER GRANTING AND DENYING SUMMARY JUDGMENTS

HELLERSTEIN, District Judge.

This is a case about stents, the splint-like, tubular devices that are inserted into weakened or occluded veins or arteries of the human body to form a strengthening mesh with their interior walls, to prevent their collapse, and to enable blood to flow. The protagonists are two biotechnology companies and some of their principals and executives. The plaintiff, Medinol, Ltd. ("Medinol"), is an Israeli company engaged primarily in research and development, and manufacturing, of stents. The defen-

dant, Boston Scientific Corporation ("Boston Scientific" or "BSC"), is a Delaware corporation that does business in many states and nations, directly and through subsidiaries. Defendant is a leading distributor of stents, some of its own make, and some manufactured by others. The individual parties are Boston Scientific's Chairman and former Chief Executive Officer, Peter M. Nicholas, and its Chief Financial Officer, Lawrence C. Best, both of whom are defendants,[1] and Medinol's Chief Executive Officer, Dr. Judith Richter, and its Chairman and Chief Technology Officer, Dr. Jacob Richter, both of whom are counterclaim and third-party defendants.

On October 25, 1995, Medinol and Boston Scientific entered into a close and extensive contractual relationship, relating to research, development, manufacturing and distribution of stents, the licensing of intellectual property, and the contribution of capital by BSC into Medinol. The relationship was to last ten years, or longer with renewals. However, following a number of years of apparent fulfillment, the relationship soured into recriminations of treachery and breach. On April 5, 2001, Medinol filed this lawsuit and, soon after, Boston Scientific filed counterclaims and third-party complaints. The charges and counter-charges of the parties raise complex issues of breach of contract, misappropriation of trade secrets, and many other statutory and common law wrongs. After extensive discovery in the United States, the United Kingdom and Israel, Medinol, BSC, Nicholas and Best have moved for summary judgment.

This opinion discusses the contractual rights and obligations of the parties, and the merits of their respective charges and counter-charges. I hold that Medinol's claims against the individual defendants

Best and Nicholas are insufficient in law, and I order them dismissed. Many of Medinol's and Boston Scientific's claims against each other are also dismissed. A core number, largely involving their disputed contentions as to their contractual relations, remain for trial. The procedures that the parties are required to follow for an early trial are also set out in the concluding paragraphs of this decision.

## I. Background

### A. Facts

Plaintiff Medinol is a privately-held Israeli biotechnology company specializing in stent development. On October 25, 1995, Medinol entered into three agreements with defendant BSC, an American leader in the field of medical technology: a Supply Agreement, a Transaction Agreement, and a Stockholder Agreement. The parties contemplated a wide-ranging partnership which, they hoped, would combine their expertise and resources to create improved stent technology and increased sales of stents.

Under the Supply Agreement, described below in more detail, Medinol agreed to develop and manufacture stents, and Boston Scientific agreed to market and distribute them. The Supply Agreement was structured as a requirements contract, obligating Medinol to sell to BSC as many stents as BSC required for resale. Under the Transaction and Stockholder Agreements, Boston Scientific was to invest some $70 million in Medinol, in two installments, in exchange for a share of ownership and a role in the management of Medinol. The Stockholder Agreement was also signed by Dr. Judith Richter, Medinol's Chief Executive Officer, and Dr. Jacob Richter, Medinol's Chairman and

---

1. I dismissed other individual defendants by my order of September 21, 2001.

Chief Technology Officer (collectively, the "Richters"). The Richters co-founded Medinol and together owned approximately two-thirds of its stock, either directly or through corporate holdings.

Boston Scientific purchased its first installment of Medinol stock for $40 million on the day it signed the Transaction Agreement, October 25, 1995. It purchased its second installment of Medinol stock for $20.5 million on February 26, 1997, buying out the interest of shareholder Benad Goldwasser, and in the process settling claims that Goldwasser had asserted against Medinol and the Richters. On March 3, 1997, BSC executed a Shareholder Release and Indemnity Letter, which "irrevocably, unconditionally and forever release[d]" Medinol, the Richters, and others from all claims arising before that date.

The relationship between the parties proceeded smoothly for several years. Medinol had developed, and BSC was marketing, Medinol's "NIR" stent, and the parties collaborated on several stents that improved on the NIR. BSC had developed its own Radius stent prior to entering into its contracts with Medinol, but it agreed in the Supply Agreement to "concentrate" its business on marketing NIR stents, and it apparently complied with this obligation. The NIR achieved several successes; it began to be sold in the European market in 1996, and in 1998 the United States Food and Drug Administration indicated that it would approve the NIR stent and delivery system without inspecting Medinol's production facilities. However, BSC also expressed its unhappiness regarding Medinol's production levels, quality, setbacks of dates set in the Supply Agreement and other matters, leading to squabbles between the parties. Nevertheless, the collaboration envisioned by the parties appeared to continue.

Both parties engaged in research and development for next-generation improvements of the NIR stent. Medinol developed the NIR Conformer, the NIR pRINce, the NIRSIDE, the NIRenal/NIR Peripheral, and the NIRflex. The NIRflex was considered the NIR's most promising successor. It was designed as an improvement of the NIR that was more flexible and better structured, so that when it expanded in diameter it would not contract in length. Medinol allegedly began work on the NIRflex in April 1998, and it finalized its design and presented it to BSC in June 1999. BSC's products included the NIR ON Ranger, the NIR ON Ranger w/Sox, and the NIR Primo premounted stent systems, the systems which BSC manufactured and sold in accordance with the Supply Agreement. BSC also developed the NIR Sine and NIR Sine II, roughly simultaneously with Medinol's development of the NIRflex. After consultations, the parties agreed to focus on the NIRflex and not pursue the NIR Sine II.

Manufacturing NIR stents involved a three-step process known as "etch, fold, and weld." In the etching stage, which Medinol subcontracted to Suron Ltd., an Israeli company, the stent pattern was chemically etched onto a sheet of surgical grade stainless steel. The next two stages used a fold-and-weld machine to transform the flat etching into a circular stent with interlocking components. Once the stent was created, it needed to be electropolished, a task which under the Supply Agreement was generally undertaken by BSC. Finally, stents needed a delivery system in order to be inserted into the human body, and BSC manufactured balloon catheters as a stent delivery system.

Since 1996, BSC also manufactured replication NIR stents for research and development but not for commercial sale.

Rather than using the etch, fold, and weld method employed by Medinol, BSC employed, in producing these stents, a cheaper laser-cut method, using a laser to cut a design from round metal tubing. Both parties now call these "NIR knock-off" stents, abbreviated as "NIRKOs." BSC produced at least 72,000 NIRKO stents from mid–1997 to mid–2000. The parties dispute if BSC produced these stents with, or without, Medinol's knowledge and authorization.

The relationship between the parties began to deteriorate amid recriminations around the year 2000. While Medinol was to be the principal manufacturer of stents under the Supply Agreement, that contract contemplated the establishment by Medinol of an "Alternative Line" which BSC would maintain and on which BSC could manufacture stents if Medinol failed to produce stents in the required quantities. On April 21, 2000, at a meeting between the Richters and James Tobin, who became BSC's Chief Executive Officer in 1999, Tobin revealed to the Richters that BSC had established another, clandestine production line for the manufacture of NIR stents, which it had called, alternately, "BBD" (for "Building a Better Deal"), or "Project Independence." This production line, housed at a BSC facility in Ireland and overseen by its subsidiary Boston Scientific Ireland Ltd. ("BSIL"), had begun to produce stents without the knowledge of Medinol, but had not engaged in any full-scale distribution.

Tobin's revelation caused animosity between Medinol and BSC, and hastened the decline of their alliance. The parties disagree regarding the course of that decline. According to Medinol, the contractual relationship was intact beforehand, but the revelation of Project Independence so shook Medinol's faith in its partner that it could not in good conscience continue to work closely together. Further, according to Medinol, less than two months after it discovered Project Independence, BSC began a second plan to rid itself of Medinol; it borrowed the blueprint for the NIRflex and used it in creating its own new stent, the Express. Through these activities, Medinol argues, BSC made clear that it was repudiating the contractual relationship between the parties.

According to BSC, it had faced numerous problems with Medinol over the years, including deficiencies in supply, increases in price, high defect rates in supply, and erratic and excessive demands regarding control over the future of the relationship. BSC argues that Medinol sabotaged the relationship, made erratic and excessive demands, and withdrew from cooperation regarding drug-coated stent technology, working instead to block the progress of that research. BSC asserts that it concluded that Medinol was no longer interested in working with BSC within their contractual relationship. In or around July 2000, BSC began developing its own Taxus stent and Express delivery system with unique drug-coated properties. BSC submitted applications for regulatory approval of these devices during 2003.

On April 5, 2001, Medinol filed this lawsuit against BSC and a number of its officers. On October 22, 2001, Medinol gave notice to BSC to cure breaches of the Supply Agreement and, on February 28, 2002, Medinol sent BSC a letter terminating the Supply Agreement. On September 12, 2002, Medinol entered into a Collaboration Agreement with W.L. Gore & Associates, Inc. for the marketing and distribution of the NIRflex stent.

## B. *The Supply Agreement*

The Supply Agreement had an initial, extendable ten-year term from October 25, 1995, the date of its execution. § 5.01. It

was intended to govern the parties' commercial relationship respecting stents. The Supply Agreement was structured as a requirements contract, whereby Medinol agreed to "design, manufacture, and sell Stents exclusively to BSC" and granted BSC the exclusive right to "use, market, distribute, and sell" those stents. § 2.01. Medinol agreed to "manufacture Stents meeting Stent Specifications in such quantities as ordered pursuant to Article III" of the contract, § 2.03, and BSC agreed "to purchase Stents developed by or for Medinol from Medinol." § 2.01.

Pursuant to Article III, BSC agreed to order stents by submitting "regular purchase order forms," and by submitting "monthly to Medinol a twelve month Forecast of Stents to be purchased by BSC." § 3.01(a). BSC "committed to purchase the number of Stents forecast to be purchased during the first three months of such Forecast, and ... committed to purchase 80% of the number of Stents forecast to be purchased during the fourth, fifth and sixth months of such Forecast." Medinol was required to "maintain or place in service sufficient production capacity to meet the Forecasts, with available excess capacity to meet periodic fluctuations in purchase orders relating to the fourth, fifth and sixth months of the Forecast of at least 125% of the Forecast." § 3.01(a). Medinol agreed that it would "promptly advise BSC if it may be unable to manufacture any Stent in the quantities forecast by BSC." § 3.01(a). BSC was also permitted to "supplement the Forecast ... by delivering additional purchase orders," which Medinol pledged to "fill on a timely basis to the extent such orders [we]re in respect of the fourth, fifth and sixth months of the then current Forecast and [we]re 125% or less of the forecast amounts, and [to] use all reasonable efforts to fill in a timely basis to the extent such

orders exceed[ed] 125% of the forecast amounts." § 3.01(b).

BSC, in exchange, promised to "use all commercially reasonable efforts to promote and market" Medinol stents "in all significant markets." § 2.11. It also agreed to "concentrate its Stent business on the development, marketing, distribution and sale" of Medinol stents, "[s]o long as there has not been a material non-acceptance" of Medinol stents in the marketplace. § 3.02(b). Medinol acknowledged that BSC had "independent, preexisting Stent technology of its own," § 2.01, and BSC was permitted to "sell Stents developed by or for it," § 3.02(b); however, if, prior to a material non-acceptance of Medinol stents in the marketplace, BSC sold its own stents when it could have sold Medinol's, it was required to pay royalties to Medinol. § 3.02(b).

The "transfer price" which BSC paid per stent on a quarterly basis was set at thirty percent of the average sale price of Medinol stents sold by BSC in the preceding quarter. § 3.02(a). BSC agreed to provide Medinol with quarterly sales reports, § 2.09, and to "keep complete and accurate records of Net Sales in sufficient detail to enable Medinol to determine payments owed to it" for a period of three years. § 2.08. BSC also agreed to allow a Medinol accountant to inspect those records. § 2.08.

To manufacture the stents, Medinol agreed to establish "at least two automated commercial volume production lines, both in facilities of Medinol to be designated by Medinol after consultation with BSC." § 2.02(a). One was to be established no later than September 30, 1996, and the other no later than March 31, 1997, and Medinol was to "use all reasonable efforts to cause such production lines to be fully operational as promptly as practicable after their establishment, but in

any event no later than six months after their establishment." § 2.02(a). Medinol also agreed to design, and, upon receipt of a purchase order from BSC, to establish "promptly" (although not before the establishment of its own two production lines), "an independent automated commercial volume production line," known as the "Alternative Line." § 2.02(a). This Alternative Line was to be established at BSC's expense in a facility chosen by BSC. § 2.02(a).

Medinol agreed to "use all reasonable efforts to cause such Alternative Line to be fully operational as promptly as practicable" after its establishment. § 2.02(b). This included "providing BSC with all assistance reasonably necessary to operate the Alternative Line," including training and documentation regarding equipment, personnel, processes, data, and quality control. § 2.02(b). Further, "[i]n connection with the operation of the Alternative Line, Medinol [granted] to BSC the sole and exclusive right, license and privilege (subject to the rights of Medinol to manufacture Stents in accordance with this Agreement) to manufacture in accordance with the terms of this Agreement, use, market, distribute and sell Stents manufactured on the Alternative Line." § 2.02(b). Medinol also authorized BSC to order chemical etching—a component of the stent manufacturing process—from Medinol's existing supplier of chemical etching services or from a second etcher designated by Medinol, and it gave BSC the right to use all of its etching-related equipment. § 2.02(e).

The Alternative Line was not to be a replacement for the manufacture of stents by Medinol. It was not to be used "unless and until such time as Medinol has failed to satisfy BSC's requirements for Stents as described in Section 3.03." § 2.02(c). Section 3.03 gave BSC the right to use the Alternative Line if Medinol failed to "satisfy BSC's requirements for two months out of any fourth month period, and the purchase orders of BSC [did] not exceed 125% of the Forecast for such periods." § 3.03. BSC then had the right to operate the Alternative Line "to the extent of Medinol's failure to supply (plus 25%) until such time as Medinol provide[d] reasonable assurances to BSC" regarding its capacity to meet its obligations, and for two months thereafter. § 3.03. If these conditions were not met, BSC was permitted to manufacture on the Alternative Line only "such nominal number of Stents (currently estimated at no more than 500 a month) necessary to maintain the Alternative Line in good operating condition." § 2.02(c). For stents manufactured on the Alternative Line, BSC was required to pay Medinol the "transfer price" less the "Burdened Costs" that Medinol would have incurred had it manufactured the stents itself. § 3.02(c).

The Supply Agreement obligated both parties to maintain quality standards for their production of stents. The parties agreed to manufacture stents pursuant to an agreed-upon set of initial specifications, any agreed-upon additional specifications, and all applicable regulations. §§ 1.01, 2.03, 6.01, Exh. A. The parties agreed to "establish sufficient quality controls," and each party was permitted, upon request, to conduct quality control inspections of the other's manufacturing. § 6.01. Both parties also agreed to submit to regulatory inspection, to "advise the other of the findings of any such inspections and [to] immediately take all steps necessary to correct any deficiencies found in the course of the inspection." § 6.03. BSC was also permitted to inspect stents shipped to it by Medinol, and the contract provided criteria under which BSC might reject faulty stents. § 3.06, Exhs. B, C. The parties agreed that upon BSC's written request, stents

would be delivered to BSC "unpolished," and BSC would perform the requisite electropolishing process on such stents, with Medinol pledging its assistance where necessary. § 2.02(d). In the event that a stent failed or its statistical rate of reliability changed, each party had a duty to report the information to the other. § 4.05. BSC had the right, "in its sole discretion, to decide whether to recall or issue an advisory letter regarding reliability or defects in Stents." § 4.06.

The parties agreed to "cooperate in the operation of [a] Development Program," with the "initial goal of developing NIR Stents for all markets" and the more general mandate "to jointly identify research and develop programs relating to Stents, including any clinical trial programs, and to review the results of programs in progress." § 2.04(a). This Development Program was to be fully funded by Medinol, except for balloons, § 2.04(b), and Medinol promised to "use all commercially reasonable efforts to initiate, pursue and advance Stent Developments, including those undertaken in connection with the Development Program, and to generally support BSC's marketing efforts." § 2.10. The parties agreed to "consult with each other in good faith before approving and initiating any new development programs or clinical trials with respect to the coating or covering of Stents." § 2.04(b).

Medinol agreed to "keep BSC reasonably informed of any changes in [its] manufacturing processes or procedures in order for BSC to determine the impact of such changes on the quality or integrity of the Stents," and BSC was required to "re-spond to such notice reasonably promptly." § 6.02. "[N]o changes in Medinol's approved manufacturing processes or procedures which [would] affect the Stent Specifications or safety or efficiency" could be made without BSC's prior written approval, which could not be "unreasonably withheld or delayed." § 6.02.

Medinol was required, at its expense, to "diligently and reasonably promptly apply for registration and regulatory approvals deemed necessary by Medinol and BSC." § 4.01. At Medinol's request, BSC was required to "provide such reasonable assistance and information as is necessary for Medinol to seek and obtain such registrations and regulatory approvals." § 4.01. The parties agreed "to cooperate with each other to obtain all FDA approvals necessary for the manufacture, marketing, distribution and sale of the Stents to be sold ... in the United States." § 4.02. More specifically, they agreed "that Medinol and BSC shall submit an application in BSC's name for a premarket approval," or "PMA," for stents to be sold in the United States. § 4.02. The PMA was to "designate Medinol as an additional manufacturer for purposes of the PMA," and would later be supplemented to add Medinol as an additional distributor. § 4.02. BSC was required to assign the PMA to Medinol if, upon termination of the Supply Agreement, BSC "retain[ed] no license from Medinol." § 4.02.

Subject to the licenses granted in the Supply Agreement, Medinol retained its own "Patent Rights" and "Proprietary Rights." [2] § 9.02. BSC also retained its

---

**2.** "Patent Rights" are defined as "all patents, patent applications, and rights to file patent applications in the United States or in a foreign jurisdiction relating to Stents, including but not limited to their manufacture, sale, use or design, and includ[ing] reissues or extensions thereof in any division, continuation, or continuation-in-part of any applications or substitutes therefore." § 1.01. "Proprietary Rights" are defined as "all proprietary rights and interest of every nature in, to or covering Stents, their processing, manufacture, or use to the extent that such rights and interests are of such legal status and nature to be capable

own Patent Rights and Proprietary Rights, § 9.02. Medinol granted BSC "a royalty-free exclusive license, subject to the terms [of the Supply Agreement], in Medinol Proprietary Rights, Company Patent Rights, Patent Rights accruing to Medinol and Stent Developments developed by Medinol to market, sell and distribute Stents for all medical applications." § 9.02. Each party agreed to "take all reasonable steps to prevent disclosure of Confidential Information," except "as may be inherent or reasonably necessary for marketing Products or for securing from any governmental agency any necessary approval or license." § 10.01. Each party consented "not to utilize in any form the other party's Confidential Information and/or Proprietary Rights except with respect to the Stents, unless otherwise agreed in writing." § 10.01.

The relationship between the parties regarding stents was intended to be far-reaching. BSC pledged to "give Medinol an opportunity to participate on a regular basis in strategic discussions with BSC with respect to marketing, distribution and sale of Stents," to "consult with Medinol in good faith with respect to the markets and geographic areas . . . in which BSC intends to market Stents," and to "meet with Medinol from time to time to review market trends." § 2.05. The parties agreed "to consult with each other in good faith in connection with [their] retention or termination of key employees primarily engaged in the Stent business," and to review "overall personnel resources that are devoted to" stents. § 2.06. The parties further agreed "to promptly report and disclose to each other all Stent Developments and to make all such Stent Developments available" to each other. § 2.07. Finally, the parties agreed to "meet not less fre-

quently than quarterly to review compliance with and performance of the parties under this Agreement." § 6.04.

The Supply Agreement had an initial ten-year term, with automatic one-year extensions. § 5.01. Upon the expiration of the original term or any extension, either party could terminate the agreement upon three months' written notice; if Medinol exercised that right, BSC would become entitled to a "perpetual, non-exclusive right" to "manufacture, use, market, distribute and sell Stents developed by or for Medinol through the date of such termination." § 5.01. Alternatively, prior to expiration, either party could terminate the contract "if the other shall fail in any material respect to observe or perform any of the material provisions of th[e] Agreement . . . and any such failure shall not be remedied within ninety calendar days after receipt of written or telexed notice from the other party specifying such failure or, in the case of payments due, within thirty calendar days after receipt of such notice." § 5.02(a). The parties agreed to continue their requirements relationship until the effective date of termination, and BSC was permitted to sell off its inventory after termination. § 5.03.

The Supply Agreement provided that its terms were severable, § 12.02, and that it "and the Transaction Agreement constitute the entire agreement among the parties with respect to the subject matter hereof." § 12.03. The parties provided that the Supply Agreement would be governed by New York law, § 12.07, and they consented to the exclusive jurisdiction of the United States District Court for the Southern District of New York. § 12.08. The parties agreed "that irreparable damage would occur in the event any provision of this Agreement was not performed in ac-

of being lawfully licensed or sold, and shall include, but not be limited to, inventions,

ideas, manufacturing know-how, technology and trade secrets." § 1.01.

cordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity." § 12.06. Finally, the parties "irrevocably waive[d] all right to trial by jury in any action ... arising out of or relating to this Agreement." § 12.12.

### C. The Transaction and Stockholder Agreements

The same day as they executed the Supply Agreement, the parties also executed a Transaction Agreement and a Stockholder Agreement. Under the Transaction Agreement, BSC was to purchase Medinol shares in two installments, the "first closing" and the "second closing." § 2.01. At the first closing, BSC was to pay $40 million in cash in return for 21,400 shares of Medinol. §§ 1.01, 2.02(b). At the second closing, BSC was to pay $30 million in cash or stock to acquire 20,059 shares of Medinol, with an option to purchase more shares, at the rate of $1,688 per share, to obtain ownership of 20% of Medinol's shares. § 1.01, 2.03(b).

Medinol agreed that it would distribute $15 million of the first $40 million installment to its shareholders other than BSC, and that it would invest the remaining $25 million in its "Stent business," including developing technological advancements for current and next generation stents, establishing two automated commercial volume production lines, obtaining regulatory approvals and protecting intellectual property, and performing clinical evaluations. § 5.02(a). As to the second closing, Medinol agreed that the cash proceeds that it received, including proceeds from the sale of BSC stock, were to be invested in the same manner as the $25 million from the first closing. § 5.02(b).

The Stockholder Agreement governed the relationships among BSC, Medinol, Dr. Judith Richter, and Dr. Jacob Richter with respect to BSC's ownership of Medinol shares. Pursuant to the Stockholder Agreement, following the first closing, "BSC shall receive not less than three days' written notice of all meetings of [Medinol's] Board [of Directors] and of all actions to be taken by the Board, shall be permitted to have one or more individuals attend each meeting of the Board as observers, and shall receive copies of all materials distributed to or by the Board." § 2.01(a). Following the second closing, and at subsequent shareholder meetings, Medinol agreed, "if so requested by BSC, [to] use its best efforts to cause a nominee of BSC to be elected to the Board," and the Richters agreed to vote all of their shares in favor of that nominee. § 2.01(b).

The Stockholder Agreement required Medinol to provide BSC with quarterly and annual financial statements, and with its annual business plan and budget. §§ 3.01(a), (b), 3.03. Medinol also agreed to allow BSC to inspect its books and records and to "discuss the affairs, finances and accounts of Medinol with representatives of Medinol, including Medinol's independent auditors." § 3.02. If Medinol "determine[d] to engage in any new line of business unrelated to the development ... manufacture, marketing and sale of Stents," it was obligated to "consult with BSC prior to actually engaging in any such line of business." § 3.04.

BSC was granted a "Right of First Negotiation" if either of the Richters "determine[d] to make a Sale of any shares of capital stock of Medinol" or if Medinol, its affiliates, or either of the Richters "determine[d] to make a Sale of" any of Medinol's intellectual property rights or "any other material asset or combination of assets of Medinol." § 4.01(a). BSC also enjoyed preemptive rights with regard to Medinol stock. §§ 4.02, 4.03. If Medinol

"at any time propose[d] to register any of its authorized but unissued shares of capital stock" for sale to the public, it promised first to give "prompt written notice to BSC of its intention to do so." § 5.01(a).

Both the Transaction Agreement and the Stockholder Agreement contained confidentiality provisions. In the Transaction Agreement, the parties promised to comply with a "Confidentiality and Non–Disclosure Agreement dated October 18, 1995 between Medinol and BSC." § 5.03. That Confidentiality Agreement governed disclosure, made "[i]n the course of discussions between the parties," of information designated as confidential. It required each of the parties to maintain information so designated "in the strictest confidence"; not to disclose such information "except to those of its employees having a need to know"; and not to use such information except "for the purpose(s) of equity investment, exclusive distribution and/or acquisition or other business relationships between the parties." The Confidentiality Agreement also obligated each party not to "analyze, decompile, disassemble, reverse engineer (or the like) any tangible product or media which constitutes, contains or in any way embodies" the other party's confidential information. In the Stockholder Agreement, BSC, Medinol, and the Richters agreed not to reveal or "use in any way detrimental to the Business, Medinol or BSC any non-public, confidential or proprietary information relating to the business or affairs of Medinol or BSC." § 6.06.

BSC, in the Transaction Agreement, contracted to "defend, indemnify and hold Medinol harmless against any and all liabilities, losses, damages, costs or expenses that Medinol may incur as a result of any action brought by any person (other than a current or former stockholder of Medinol)

against Medinol arising from Medinol's execution or performance of this Agreement, the Supply Agreement or the Stockholder Agreement," unless Medinol breached the warranties contained in the Transaction Agreement. § 9.03

Both the Transaction Agreement and the Stockholder Agreement contained integration clauses, severability clauses and clauses providing for specific performance. Transaction Agreement §§ 9.02, 9.04, 9.06; Stockholder Agreement §§ 6.03, 6.04, 6.07. The parties agreed that the Stockholder Agreement would be governed by New York law, Stockholder Agreement § 6.08, and that the Transaction Agreement would be governed by New York law "[e]xcept to the extent that Israeli law is mandatorily applicable to the sale of Shares." Transaction Agreement § 9.07. In both agreements, the parties consented to the exclusive jurisdiction of the United States District Court for the Southern District of New York, and in both they agreed to waive their rights to trial by jury. Transaction Agreement §§ 9.08(a), 9.12; Stockholder Agreement §§ 6.07(a), 6.10.

## D. The Pleadings

Medinol's Second Amended Complaint (the "Complaint") asserts eleven claims for relief against Boston Scientific, and names two of its officers as defendants, Chairman and former Chief Executive Officer Peter M. Nicholas, and Chief Financial Officer Lawrence C. Best. The core of Medinol's Second Amended Complaint revolves around Project Independence, which Medinol asserts "was a systematic project to copy and steal Medinol's proprietary stent designs and proprietary method for manufacturing stents," which defendants employed "so that they could rid themselves

of Medinol." [3] According to Medinol, the defendants entered into this scheme because they took note of the high profit margins Medinol was experiencing, and they hoped to appropriate those profits for BSC. Project Independence, Medinol alleges, was part of a broader conspiracy known as "Buy/Bye Medinol," an effort to "steal Medinol's technology and then either buy Medinol out cheaply or get rid of it." In this vein, BSC allegedly undertook other efforts to thwart Medinol's success and thereby depress its value, such as delaying the launch of Medinol's new stents, prioritizing work on its own stents over Medinol's, and interfering with Medinol's planned initial public offering. Medinol thus asserts claims, not only for breach of contract, but also for unjust enrichment, breach of fiduciary duty, fraud and fraudulent concealment, negligent misrepresentation, misappropriation of trade secrets, conspiracy, and RICO (18 U.S.C. § 1962(c) and (d)). Medinol seeks damages and declaratory and injunctive relief.

Boston Scientific alleges six counterclaims against Medinol, one of which it also asserts personally against Dr. Judith Richter and Dr. Jacob Richter. BSC's Answer and its First Amended Counterclaims allege that from early in the parties' relationship, "Medinol has acted to increase its leverage over BSC and alter the terms of the agreements it had executed." According to BSC, Medinol's efforts in this regard included manipulating its supply of stents to BSC's disadvantage, failing to establish the Alternative Line, failing to meet its research and development obligations, charging unjustifiably high prices for stents, and failing to allow BSC to conduct quality control inspections, among other things. Countering Medinol's allegations, BSC alleges that "[u]ltimately, Medinol simply refused to participate in the relationship in an effort to force BSC either to buy Medinol for an inflated price or to allow Medinol to go its own way." BSC asserts counterclaims for breach of contract, improper termination of the Supply Agreement, breach of the covenant of good faith and fair dealing, and for declaratory judgment; it seeks damages and declaratory and injunctive relief.

In response to BSC's counterclaims, Medinol filed counterclaims and third-party claims of its own, seeking declaratory judgment. Medinol asserts four counterclaims seeking declarations that BSC's counterclaims must fail, that BSC is liable to Medinol for indemnification, that BSC has breached the March 3, 1997 Release which it executed, and that BSC has forfeited the right to nominate a director to Medinol's Board of Directors.

### E. Procedural History

Medinol filed this lawsuit on April 5, 2001, naming as defendants Boston Scientific and various of its officers and directors. On May 22, 2001, Boston Scientific filed its Answer and Counterclaims. On June 18, 2001, the individual defendants moved to dismiss the case and, on September 21, 2001, I partially granted their motions, dismissing all individual defendants except for Peter Nicholas and Lawrence Best. Medinol filed its Second Amended Complaint on October 5, 2001; BSC filed its Answer on October 22, 2001; and Medinol filed its Answer and Counterclaims on November 7, 2001. Peter Nicholas and Lawrence Best filed their Answers on January 16, 2002, and BSC filed

---

**3.** This language comes from a summary of the Second Amended Complaint that Medinol filed. I had invited both parties to file such summaries by my order of November 7, 2002. Similarly, the quoted language in the next paragraph is taken from BSC's summary of its Amended Counterclaims, filed the same date.

Amended Counterclaims and an Amended Third–Party Complaint on June 19, 2002. During and after this period, the parties engaged in extensive discovery in the United States, the United Kingdom, and Israel, and I resolved a number of disputes, including one reported at *Medinol Ltd. v. Boston Scientific Corp.,* 214 F.R.D. 113 (S.D.N.Y.2002), relating to an issue of attorney-client and work product privileges.

Both Medinol and Boston Scientific, and Nicholas and Best as well, filed motions for summary judgment on August 8, 2003. I heard oral argument on November 25 and December 16, 2003. I have considered the voluminous submissions of the parties and their positions at oral argument. I now grant in part and deny in part Medinol's motion for summary judgment; grant in part and deny in part Boston Scientific's motion for summary judgment; and grant the summary judgment motions of Nicholas and Best.

## II. Discussion

### A. Summary Judgment

Summary judgment may be granted if there are "no genuine issues as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to come forward with competent evidence:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Although all facts and inferences therefrom are to be construed in favor of the party opposing the motion. *Harlen Assocs. v. Village of Mineola,* 273 F.3d 494, 498 (2d Cir.2001), that party must raise more than just a "metaphysical doubt" as to a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen,* 273 F.3d at 499. Accordingly, if the "evidence favoring the nonmoving party .... is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

### B. Project Independence

Lying at the heart of this case is Project Independence, or BBD.[4] BBD stands for "Bringing a Better Deal" to Boston Scientific, and Medinol alleges that BBD was a sinister plan on the part of BSC—a conspiracy among it and its top officers, in-

**4.** The parties each prefer their own names and epithets. I give them no significance, and I use their terms interchangeably.

cluding Nicholas and Best—to circumvent the contract, steal Medinol's technology, and appropriate Medinol's profits.

On April 21, 2000, Boston Scientific's new Chief Executive Officer, James Tobin, met with the Richters and disclosed that Boston Scientific had established a production line in Ireland that was not contemplated by the Supply Agreement and had been kept secret from Medinol. Tobin described the meeting as "very painful" and "embarrassing," but considered that he had to inform Medinol about BBD because a criminal investigation of the Department of Justice into Boston Scientific's practices had uncovered it. No stents were ever actually sold from this clandestine production line, but its relatively large capacity was 6500 stents per week.

The purpose behind Project Independence is disputed. Medinol argues that BSC wished to capture the large profits that it believed Medinol enjoyed from stent manufacturing, and that BSC adopted its scheme to gain "independence" from Medinol. Medinol alleges that BBD was the second half of a larger plan known as "Buy/Bye Medinol," a comprehensive plan to achieve independence from Medinol via one of two routes: either depressing Medinol's stock price and buying it cheaply, or cutting Medinol out of the deal and stealing Medinol's profits. Boston Scientific argues that this was simply an attempt to preserve the deal by assuring that its demand for stent production would be met without any problem. The Department of Justice concluded that "[t]he goal of this project was to establish a BSC-related stent manufacturing facility in Ireland that was hidden/kept secret from Medinol."

Eight counts of Medinol's Complaint contain allegations relevant to Project Independence.[5] BSC moves for summary judgment to dismiss these claims, and Medinol moves for summary judgment to declare that BSC's denials and defenses are legally inadequate. BSC contends that it had the right to establish Project Independence, either because it was "cover" for Medinol's failure to fulfill its commitments in the contract, or because of the license afforded to BSC in the Supply Agreement. In addition, BSC argues that even if Project Independence was a violation of the contract, BSC cannot be held liable because it caused Medinol no damages. Medinol argues to the contrary.

For the reasons set out below, I grant these aspects of Medinol's motion for summary judgment and deny BSC's motion for summary judgment. I hold that the doctrine of cover and the license provisions of the contract did not justify Project Independence, and that Medinol may prove at trial such damages as it may have suffered.

### 1. Cover

Under section 2.02 of the Supply Agreement, Medinol agreed to build three production lines for the manufacture of NIR stents, two to be operated by Medinol, and one to be placed under BSC's control. As the contract provided, Medinol agreed first to establish "at least two automated commercial volume production lines for the manufacture of NIR Stents, both in facilities of Medinol." § 2.02(a). In addition, Medinol agreed to "design for BSC an independent automated commercial volume production line for the manufacture of Stents (the 'Alternative Line') ... in a

---

**5.** These counts are: Count I (breach of contract); Count III (breach of fiduciary duty); Count IV (fraud); Count V (fraudulent misrepresentation); Count VI (negligent misrepresentation); Count VII (misappropriation); Count X (RICO, 18 U.S.C. § 1962(c)); and Count XI (RICO conspiracy, 18 U.S.C. § 1962(d)).

facility of BSC to be designated by BSC," at BSC's expense. § 2.02(b). This third line, the Alternative Line, was to have full capacity to manufacture NIR stents, not for regular use, but as a safety measure to protect BSC in the event that Medinol failed to provide it with adequate supply. The agreement gave BSC the right to manufacture only five hundred stents a month on the Alternative Line, the amount stipulated as necessary to keep the machinery in good working order, "unless and until such time as Medinol has failed to satisfy BSC's requirements for Stents." § 2.02(c).

BSC identified its facility in Ireland, operated by its subsidiary BSIL as the site for the Alternative Line. Medinol sent machinery to Ireland, and an employee to help make the machinery operational and to help train BSIL employees. However, Boston Scientific determined that it would itself establish independent, alternative facilities in Ireland, and named its efforts "Project Independence." Boston Scientific argues that Medinol was an unproven company, lacking the track record to be an assured source of reliable supply, that the purpose of its Alternative Line was to enable BSC to have an independent source to overcome the risk of an erratic supplier, and that the machinery Medinol delivered to Ireland was inadequate and deficient. Boston Scientific argues that Project Independence was "cover" for Medinol's inadequacy.

Boston Scientific's argument is fallacious, technically under the law of "cover," because it cannot first contract with a party of known limitations and then complain of just those limitations. It is as if a man marries a poor woman, and then complains that she is not rich.

■ Cover, as authorized by Article 2 of the Uniform Commercial Code, applies to contracts for the sale of goods. N.Y.

U.C.C. §§ 2–711(1), 2–102. The threshold question in examining the legal sufficiency of BSC's defense of cover, therefore, is whether the Supply Agreement is a contract for the sale of goods and is therefore subject to the U.C.C.; if not, BSC has no right to cover. "In determining whether a contract is for the sale of goods, and thus covered by the U.C.C., it is necessary to look to the 'essence' or main objective of the parties' agreement. If the provision of services or rendition of other performance predominates and is not merely incidental or collateral to the sale of goods, then the contract will not be subject to" the U.C.C. *Dynamics Corp. of America v. International Harvester Co.*, 429 F.Supp. 341, 346 (S.D.N.Y.1977) (Weinfeld, J.) (applying New York law); *see also Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737 (2d Cir.1979) (applying New York law and following *Dynamics Corp.*); *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 90 F.Supp.2d 401 (S.D.N.Y.2000) (Kaplan, J.) (same).

The Supply Agreement between Medinol and BSC is complex and multifaceted. Although the provisions requiring Medinol to supply stents to accommodate BSC's projected distribution and sales predominate, and Medinol's obligations to design an Alternative Line for BSC and to train its personnel appear to be "incidental or collateral" rather than "independent and several," *Dynamics Corp.*, 429 F.Supp. at 346, I hesitate to make such a ruling in the context of a summary judgment motion. *See, e.g., International Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76 (2d Cir.2002) (reversing grant of summary judgment based on contract interpretation where relevant contract term was held to be ambiguous). Accordingly, for the purpose of the following analysis, I assume, without deciding, that the Uniform Commercial Code applies, and I proceed to

examine if BSC has made proper use of the defense of "cover."

The Official Comment to the U.C.C. explains the doctrine of cover as "a remedy aimed at enabling [the buyer] to obtain the goods he needs." N.Y. U.C.C. § 2–712, Official Comment 1. Courts and commentators have understood cover as a specialized subset of either the right to mitigate damages or, alternatively, the right to exercise self-help. On the one hand, cover may be viewed as a species of mitigation; a disappointed buyer may discharge his obligation to mitigate damages through purchasing replacement goods, and the breaching seller is liable only for the value of the promise originally made less the value of replacement, leaving aside the issue of special goods. *See, e.g., Larsen v. A.C. Carpenter, Inc.,* 620 F.Supp. 1084, 1136 (S.D.N.Y.1985) (viewing cover as a form of mitigation, and relying on N.Y. U.C.C. § 2–715(2)(a), which provides for mitigation of damages "by cover or otherwise"); *Pepper's Steel & Alloys, Inc. v. Lissner Minerals & Metals, Inc.,* 494 F.Supp. 487, 498 (S.D.N.Y.1979) (equating cover and mitigation); *Saboundjian v. Bank Audi (USA),* 157 A.D.2d 278, 556 N.Y.S.2d 258 (1990) (same); III E. Allan Farnsworth, Farnsworth on Contracts § 12.11–12.12, at 225–27, 235 (2004) (same); Charles J. Goetz & Robert E. Scott, *The Mitigation Principle: Toward a General Theory of Contractual Obligation,* 69 Va. L.Rev. 967, 971–72 (1983) (same).

Alternatively, cover may be viewed as a species of self-help; where the disappointed buyer must either find substitute goods or face substantial losses, the law instructs him to do the former. *See, e.g., Fertico Belgium S.A. v. Phosphate Chemicals Export Ass'n,* 70 N.Y.2d 76, 517 N.Y.S.2d 465, 510 N.E.2d 334 (1987) (buyer may seek "the partial self-help of cover"); II Farns-

worth on Contracts § 8.19a, at 546 (grouping buyer's right to cover and seller's right to resell as examples of right to self-help, but warning that the boundaries of self-help are risky and ill-defined); Celia R. Taylor, *Self–Help in Contract Law: An Exploration and Proposal,* 33 Wake Forest L.Rev. 839, 869 (1998) ("[c]over is a self-help remedy"). Either way, the buyer must act "in good faith and in a reasonable manner." N.Y. U.C.C. § 2–712, Official Comment 2.

The U.C.C. provides three conditions for a buyer's cover. First, the seller must have made defective or inadequate delivery of the goods ordered by the buyer:

> Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2–612), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid (a) "cover" and have damages under the next section as to all the goods affected whether or not they have been identified to the contract . . .

N.Y. U.C.C. § 2–711(1). Second, the buyer must obtain cover "in good faith and without unreasonable delay" by contracting "to purchase goods in substitution for those due from the seller":

> (1) After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.
>
> (2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter

defined (Section 2–715), but less expenses saved in consequence of the seller's breach.

(3) Failure of the buyer to effect cover within this section does not bar him from any other remedy.

N.Y. U.C.C. § 2–712. Third, like any other remedy, cover is available only after the buyer has given the seller due notice of breach: "Where a tender has been accepted, (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." N.Y. U.C.C. § 2–607(3).

 Thus, the buyer may cover where the seller has failed to provide goods that it had contracted to deliver, by buying the same goods from elsewhere, and charging the delinquent seller with the increased cost of the cover. *See, e.g., Fertico Belgium*, 517 N.Y.S.2d 465, 510 N.E.2d at 335 (seller breached its contract to timely deliver goods to buyer, "who properly sought cover (under the Uniform Commercial Code that means acquiring substitute goods) from another source" in order to avoid breaching the buyer's duty to a third party). The present situation is different. BSC's complaint is that Medinol was slow to design an alternative manufacturing line which might, in the future, be necessary to supply BSC with stents if Medinol ever failed to meet BSC's order of stents. In truth, as Tobin of BSC admitted, BSC chose to build its own manufac-

turing facility, in stealth and for its own reasons, to be independent of, and to replace Medinol, as a source of supply. This is breach, not "cover" as the U.C.C. defines the term.

A number of incongruities between the present case and the typical instance of cover demonstrate further that this case cannot fit into the legal framework of cover. First, the seller's defective supply of goods must be "with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract." N.Y. U.C.C. § 2–711(1). BSC does not claim, as it cannot, that Medinol's asserted failure with respect to designing an Alternative Line was a breach of "any goods involved," or "with respect to the whole," "go[ing] to the whole contract." *Id.* The U.C.C. defines "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities ... and things in action." *Id.* § 2–105(1). An Alternative Line is not "goods." Cover extends to goods, not to a line to manufacture goods, or methods to produce them.[6]

Second, the undisputed facts make it clear that BSC was developing its Project Independence facilities in a separate and secret Irish facility, simultaneously with Medinol's work on the Alternative Line, with both sets of facilities being simultaneously and substantially developed in the summer of 1997. Clearly, Project Inde-

---

**6.** Alongside its argument that it was covering for Medinol's failure to supply the Alternative Line, BSC also seems to imply that it was covering for Medinol's failure to supply stents, and for Medinol's failure to supply the licenses which were granted to it by the Supply Agreement. Both of these arguments fail. First, stents are clearly "goods" under the U.C.C., but BSC's creation of another production line cannot be cover for Medinol's alleged failure to supply goods that Medinol was required to deliver. Proper cover, as defined by N.Y. U.C.C. § 2–712, is effectuated through the "purchase of or [through a] contract to purchase goods in substitution for those due from the seller," not through procuring for oneself an alternative source of supply. Second, rights under a license are not "goods" under the U.C.C., as explained above, and as such cannot be an appropriate subject of cover.

pendence was intended to operate alongside the Alternative Line, not as "substitution" for it. Further, BSC did not reject Medinol's work in designing and developing the Alternative Line, and thus it cannot claim the right to cover for it. "[T]he Uniform Commercial Code limits the recovery options of a buyer who accepts and keeps defective goods. Whereas a buyer who rejects or revokes acceptance of nonconforming goods may seek damages for 'cover,' N.Y. U.C.C. §§ 2–711 and 2–712 (McKinney 1964), a buyer who retains defective goods may recover as damages only the loss resulting in the ordinary course of events from the seller's breach, N.Y. U.C.C. § 2–714." *Long Island Lighting Co. v. IMO Industries, Inc.*, 1990 WL 64588, at *3 (S.D.N.Y. May 3, 1990), 1990 U.S. Dist. Lexis 5351, at *9–*10. Since BSC did not reject the Alternative Line, its remedy would not be cover, but only such provable loss as might result in the ordinary course of events from Medinol's alleged breach of its duty to design and develop the Alternative Line.

Third, BSC did not intend to pass on to Medinol the increased cost it incurred in establishing Project Independence. Under U.C.C. § 2–7612(2) and almost all relevant case law, that would have been its damage if it were pursuing cover. *See, e.g., Allied Semi–Conductors Int'l v. Pulsar Components Int'l*, 907 F.Supp. 618 (E.D.N.Y.1995); *Jewell–Rung Agency, Inc. v. Haddad Org., Ltd.*, 814 F.Supp. 337 (S.D.N.Y.1993). Significantly, BSC does not allege that it suffered any "damages" at all stemming from Medinol's allegedly delayed or defective supply of the Alternative Line for which it might be able to justify a need for cover. *See Chronister Oil Co. v. Unocal Refining & Marketing*, 34 F.3d 462, 465 (7th Cir.1994) (suggesting that the cover provision is inappropriate when the buyer has not been hurt). The allegedly imperfect installation of the Al-

ternative Line did not materially harm BSC and, accordingly, it cannot claim a remedy that is tied to damages.

Fourth, BSC did not undertake Project Independence with the required good faith. N.Y. U.C.C. § 2–712. BSC's bad faith is shown by the stealth with which it proceeded with Project Independence, and by its sending an employee, engineer Aiden Flanagan, to Medinol's facility in Israel with secret instructions clandestinely to copy Medinol's machinery and know-how in manufacturing stents. BSC's successor CEO, Tobin, essentially admitted such bad faith when he finally revealed Project Independence to Medinol. Thus, BSC did not meet the "good faith" prerequisite to cover prescribed by § 2–712.

Finally, developing manufacturing capacity for oneself, rather than purchasing a substitute manufacturing line from another vendor, is no more cover than issuing goods from one's own inventory, for "[y]ou can't 'purchase,' whether in ordinary language or UCCspeak (*see* § 1–201(32)), what you already own.... Taking a good out of your inventory and selling it is not a purchase in a market." *Chronister Oil*, 34 F.3d at 465; *cf. Dodd, Mead & Co. v. Lilienthal*, 514 F.Supp. 105, 107–08 (S.D.N.Y.1981) (rejecting defendant's argument that he could "cover" for undelivered books by printing his own copies, stating that such self-help "breach[ed] the contract egregiously"). Accordingly, BSC's effort to create its own manufacturing line, clandestinely and in derogation of that which Medinol had zealously guarded, cannot constitute "cover."

### 2. License

■ BSC also contends that the production line that it created through Project Independence was licensed pursuant to the Supply Agreement, and therefore legiti-

mate. BSC argues that the Supply Agreement gave it a license to use and manufacture stents and, therefore, to develop a substitute manufacturing line. BSC's argument is without merit.

Two provisions of the Supply Agreement grant licenses to BSC; neither supports its argument. The first, section 2.02(b), reads as follows:

> In connection with the operation of the Alternative Line, Medinol will grant to BSC the sole and exclusive right, license and privilege (subject to the rights of Medinol to manufacture Stents in accordance with this Agreement) to manufacture in accordance with the terms of this Agreement, use, market, distribute and sell Stents manufactured on the Alternative Line in the Territory.

The second license section of the Supply Agreement, section 9.02, provides:

> Medinol hereby grants to BSC a royalty-free exclusive license, subject to the terms hereof, in Medinol Proprietary Rights, Company Patent Rights, Patent Rights accruing to Medinol and Stent Developments developed by Medinol to market, sell and distribute Stents for all medical applications.

Thus the first license grants five rights: to (1) manufacture, (2) use, (3) market, (4) distribute, and (5) sell. That license is limited, however, to stents produced on the Alternative Line. The second license, which is not so limited, grants only the last three of those five rights, to market, distribute, and sell. It does not grant the first two rights, to (1) manufacture and (2) use. Thus Medinol licensed to BSC the rights to (1) manufacture and (2) use its stents only in connection with the Alternative Line.

Clearly, BSC was not granted the right to develop its own manufacturing facilities. The first license grants to BSC the right to manufacture stents, but *only* "[i]n con-

nection with the operation of the Alternative Line." Project Independence was not undertaken "[i]n connection with the operation of the Alternative Line," but separately and independently of the Alternative Line. The license provided by section 2.02(b) did not authorize Project Independence.

BSC argues that the right to manufacture stents is included in the license in section 9.02, even though the license provides a grant only "to market, sell, and distribute stents." BSC argues that the terms, "Patent Rights" and "Proprietary Rights," in the grant of the section 9.02 license are defined to include the right to "manufacture." The argument proceeds tortuously, as follows: Section 1.01 defines "Patent Rights" and "Proprietary Rights" broadly to include manufacture:

> "Patent Rights" means all patents, patent applications, and rights to file patent applications in the United States or in a foreign jurisdiction relating to Stents, including but not limited to their manufacture, sale, use or design. . . .

> "Proprietary Rights" means all proprietary rights and interests of every nature in, to or covering Stents, their processing, manufacture or use . . . and shall include, but not be limited to, invention, ideas, manufacturing know-how, technology and trade secrets.

The definitions, however, cannot displace the carefully constructed granting clauses. The grant by Medinol in section 9.02 of "Proprietary Rights" and "Patent Rights" was for a limited end use, "to market, sell and distribute Stents for all medical applications." BSC's argument would ignore the limitation, and blur the careful distinction in the grants of licenses, by section 2.02(b) in connection with the operation of the Alternative Line, and only in that connection, and by section 9.02 in

connection with the basic purpose of the Supply Agreement, to enable BSC to "market, sell and distribute" the Stents "developed by Medinol," for "all medical applications."

Thus, the rights to manufacture and use were purposefully included in section 2.02(b), and purposefully omitted from section 9.02. Although *expressio unius est exclusio alterius* is a canon of construction rather than a rule of law, *see* William N. Eskridge, Jr. et al., *Legislation* 824–25 (3d ed.2001); Kent Greenawalt, *Legislation* 202–05 (1999), that understanding is inescapable given the basic purpose of the agreement. Medinol, in the normal course of business, was to manufacture stents and sell them to BSC, and BSC was to market and sell those stents throughout the United States and elsewhere. In case Medinol faltered in its supply of stents and showed incapacity to produce them according to BSC's forecasts of its purchasing needs, BSC would be permitted to manufacture its own supply, through an Alternative Line that Medinol was required to establish. Thus the basic license, granted by section 9.02, gave BSC the right only to market, distribute and sell, for those were the activities which BSC was to undertake in the normal course of its business as marketer and distributor of Medinol's stents. BSC was granted the right to manufacture and use stents only in connection with the Alternative Line, provided by section 2.02(b). Thus the section 9.02 license does not permit BSC to manufacture stents, and does not authorize BSC to establish Project Independence. BSC may not rely on the contract to justify a breach of contract.

"[C]ourts have found implied licenses only in 'narrow' circumstances." *Smith-Kline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21, 25 (2d Cir.2000); *see also SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F.Supp.2d 301, 317 (S.D.N.Y.2000) (same). In this case, it would be hard to believe that the Supply Agreement would articulate with such precision the requirements of the two primary manufacturing lines and of the Alternative Line, but would permit the construction of a fourth manufacturing line *sub silento*. I decline to find an implied license in this instance, where the contract does not extend so far. I hold that the licenses found in the Supply Agreement do not authorize Project Independence.

### 3. Damages

Aside from arguing that Project Independence was authorized, BSC also claims that Medinol cannot maintain any cause of action based on it, because Project Independence caused Medinol no harm. It is undisputed that BSC manufactured relatively few stents from the Project Independence line, and that no Project Independence stent was ever sold commercially. BSC also notes that it never submitted Project Independence for approval to the FDA, and it claims that it never used any stents produced from Project Independence in research and development. BSC acknowledges that in the course of creating Project Independence it shared Medinol's proprietary information with third parties (the potential etchers with which it proposed to contract, instead of Medinol); it claims that it was authorized to do so and that there is no evidence that any damage stemmed from its disclosure of that information.

Medinol, conversely, claims several types of damages stemming from Project Independence. First, it argues that Project Independence was a material breach and repudiation of the contract, and that BSC is therefore liable for all profits that Medinol would have earned from the contract had it continued. Second, Medinol

disputes BSC's claim that it did not sell any Project Independence stents, or use any of them in research. Third, Medinol claims that Project Independence delayed the launch of several Medinol stents to the market, causing it significant damage. Medinol presents evidence that Project Independence stents were, in fact, used by BSC for internal research and development; Medinol points to internal BSC e-mails, documents sent by Eric Stenzel, the Project Independence stent engineer, and Stenzel's admissions.[7]

■ Initially, I note that damages are not an element of a breach of contract claim. Even if Medinol cannot prove any damages stemming from Project Independence, it may still maintain its claim for breach of contract and, if it is successful, recover nominal damages. See ESPN, Inc. v. Office of the Commissioner of Baseball, 76 F.Supp.2d 416, 421 (S.D.N.Y.1999) ("It is a well-settled tenet of contract law that even if the breach of contract caused no loss or if the amount of the loss cannot be proven with sufficient certainty, the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of the loss, if any." (quoting Hirsch Elec. Co. v. Community Servs., Inc., 145 A.D.2d 603, 536 N.Y.S.2d 141, 142–43 (1988))). Accordingly, this prong of BSC's motion must fail, at least with regard to the breach of contract claim.

■ The primary type of damage that Medinol alleges is lost profits. As I recently held, the party seeking recovery for lost profits on a breach of contract claim faces a "high standard":

> Under New York law, loss of future profits which would have been earned but for the breach of contract are recoverable, provided they satisfy three criteria. "First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty." Kenford Co. v. County of Erie, 67 N.Y.2d 257, 502 N.Y.S.2d 131, 493 N.E.2d 234, 235 (1986) (Kenford I). Third, "there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made." Id.

Great Earth International Franchising Corp. v. Milks Development, et al., 311 F.Supp.2d 419, 432 (S.D.N.Y.2004). In this case, Medinol has admitted that its experts have not identified with certainty any lost profits that arose from Project Independence. See The Medinol Parties' Memorandum of Law in Opposition to Boston Scientific Corporation's Motion for Partial Summary Judgment at 26–27. BSC, however, may have potential liability for royalties, for if it sold its own stents, rather than stents developed by Medinol, and there had not first been a material, non-acceptance of Medinol stents in the marketplace, BSC could become liable to Medinol for royalties. Supply Agreement § 3.02(b). This analysis would apply equally to stents used internally for research and development that BSC would have otherwise purchased from Medinol.

---

7. See, e.g., Millson Exhibit 195 (Stenzel Tr. at 604: "Q. On how many different occasions did you send BBD stents to Scimed? A. I recall two times."); 308 (email from Stenzel to Matt Miller, Feb. 25, 1999, attaching data regarding Project Independence stents used at Scimed); 315 (email from Stenzel to Stephen Paidosh, April 19, 1999: "BBD could play a part in supplying R & D with stents used for trials. Matt mentioned later that their lasers are making about 300–400/week for Scimed"); 410 (undated "Executive Summary" listing stent inventory, including 108 stents "Sent to Vendors" and 73 stents "Used for studies"). Scimed is BSC's Scientific and Medical research arm.

The Supply Agreement also imposed a good faith obligation on BSC to distribute and sell Medinol-developed stents "in all significant markets," *id.* §§ 2.11, 3.02(b), and breach by BSC may also give rise to damages. *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.,* 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142 (1972). Internal BSC correspondence shows, for example, that BSC apparently used its own stents for research and development, instead of purchasing them from Medinol. The issue of contract damages must be left for trial. And, as long as that is so, I note also that the Second Circuit has held that it is not always necessary for the aggrieved party to prove its damage with "scientific rigor"; "where a wrong has been done, the courts will endeavor to make a reasonable estimate of damages":

> New York courts do not require scientific rigor in the calculation of damages. "When it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be any good reason for refusing, on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he had caused is uncertain." This principle has been restated by the Supreme Court: where a wrong has been done, the courts will endeavor to make a reasonable estimate of damages.

*Lexington Products, Ltd. v. B.D. Communications, Inc.,* 677 F.2d 251, 253 (2d Cir. 1982) (citations omitted); *see also Preferred Health Care v. Empire Blue Cross & Blue Shield,* 1997 WL 160489, at *6 (S.D.N.Y. April 4, 1997), 1997 U.S. Dist. Lexis 4298, at *19 (counterclaimant's "admission that its losses are difficult to calculate precisely is an insufficient basis for dismissal"); *V.S. International, S.A. v. Boyden World Corp.,* 90 Civ. 4091, 1993 WL 59399, at *7 (S.D.N.Y. Mar. 4, 1993), 1993 U.S. Dist. Lexis 2586, at *20 ("[I]f plaintiffs demonstrate a genuine issue of fact as to the existence of actual damages resulting from the breach of contract, then summary judgment … is inappropriate even if the precise amount or extent of the damages is still somewhat uncertain").

Accordingly, I hold that factual issues exist on the question of damages, and that Medinol has set forth sufficient evidence to defeat summary judgment on this point. *See* Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). I deny BSC's motion on this score.

### 4. Summary

For the reasons stated, I grant Medinol's motion and hold that BSC's cover and license defenses for Project Independence are insufficient as a matter of law. Those defenses are stricken. I hold further that the existence and extent of any royalties or damages flowing to Medinol from BSC are issues of fact that will remain for trial. I therefore deny BSC's motion for summary judgment, and I hold that Medinol may maintain its causes of action stemming from Project Independence.

### C. Regulatory Fraud

Medinol manufactured stents; BSC manufactured the delivery system, the balloon catheters that enabled the stents to be inserted into the body. The stents and delivery system were subject to regulatory oversight by the FDA, and the parties contemplated, in § 4.02 of the Supply Agreement, that they would jointly submit an application "in BSC's name" for a premarket approval ("PMA"), which would "designate Medinol as an additional manufacturer." Medinol alleges that BSC

breached its obligation under this section, instead submitting a PMA which deceived the FDA into accepting its assertion that Medinol was merely a "component supplier/vendor." Medinol alleges as follows:

> Defendants took steps to secure approval from the FDA to market and sell their knock-off NIR stents. Their plan was falsely to represent to the FDA that BSC was the sole manufacturer of the NIR stent system and that Medinol was simply a component supplier/vendor.... In furtherance of this plan, Defendants submitted to the FDA a PMA application, dated January 27, 1998, that falsely portrayed BSIL as a stent manufacturer and Medinol as a supplier/vendor. BSC also took a number of steps in violation of its agreements with Medinol in order to further its plan to deceive the FDA.

Second Amended Complaint ¶ 18.

BSC moves for summary judgment against the causes of action relating to this set of allegations. According to BSC, the parties jointly drafted the PMA, and they agreed to describe Medinol as a "component supplier/vendor" in order to dissuade the FDA from inspecting Medinol's production facilities. According to BSC, the parties took care to include a completely candid, 400–page factual section of the PMA regarding Medinol's stent production, and they took a position with which the FDA ultimately agreed, even after Medinol's later attempts to persuade it to change its stance.

■ BSC identifies, as causes of action which relate in part to Medinol's allegations regarding regulatory fraud, Count IV for fraud, Count IX for common law conspiracy, Count X for RICO, and Count XI for RICO conspiracy. Because I dismiss the last three of those counts on other grounds, I review this motion in the context of Medinol's fraud claim. "Under

New York law, to state a claim for fraud a plaintiff must demonstrate:

> (1) a misrepresentation or omission of material fact;
>
> (2) which the defendant knew to be false;
>
> (3) which the defendant made with the intention of inducing reliance;
>
> (4) upon which the plaintiff reasonably relied; and
>
> (5) which caused injury to the plaintiff."

*Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir.2001) (citing *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370, 1373 (N.Y. 1996)). Medinol cannot raise a material issue of fact with regard to each of these elements, and accordingly, I grant summary judgment on this aspect of BSC's motion.

Under the Food, Drug and Cosmetic Act, all "devices intended for human use" are classified as Class I, II, or III, with Class III devices being the most closely scrutinized. 21 U.S.C. § 360c(a)(1). Both parties agree that stents fall into Class III and, accordingly, they may not be sold without receiving premarket approval from the FDA. To receive approval, a manufacturer submits a PMA. *Id.* § 360e(c).

The Act authorizes the Secretary of Agriculture to "prescribe regulations requiring that the methods used in, and the facilities and controls used for, the manufacture ... and installation of a device conform to current good manufacturing practice, as prescribed in such regulations." *Id.* § 360j(f)(1)(A). The regulations, known as the Quality System Regulations ("QSR"), apply to manufacturers of "finished devices," not to suppliers of "components." 21 C.F.R. § 820.1(a)(1). Thus, if the stent was a finished device, then Medinol, its manufacturer, would be subject to the requirements of the QSR,

including FDA inspection. *Id.* § 820.1(d). If the stent was a "component" of a stent delivery system, Medinol would not be subject to the QSR.

The regulations define both terms. A "finished device" is "any device or accessory to any device that is suitable for use or capable of functioning, whether or not it is packaged, labeled, or sterilized." *Id.* § 820.3(1). A "component" is "any raw material, substance, piece, part, software, firmware, labeling, or assembly which is intended to be included as part of the finished, packaged, and labeled device." *Id.* § 820.3(c). Stents do not clearly fall into either category; they are more than a "raw material" or a "part" of a delivery system, but they are not "capable of functioning" unless embedded in a delivery system. Although the FDA once approved the sale of a stent without a delivery system, the Jomed Jostent, the approval was for limited purposes. The parties point to no prior FDA decision determining if a stent is either a finished device or a component.

■ Clearly, the position taken by BSC, that stents were "components" was not fraudulent. Medinol points to no material factual misstatements in the PMA. A strategy of attempting to convince the FDA of a particular position is appropriate advocacy, and not a fraud. Furthermore, Medinol was aware of BSC's position and helped to draft it, as contemplated by the cooperation obligation of section 4.02 of the Supply Agreement. Medinol is estopped from arguing that BSC's position was a fraud.

Accordingly, BSC did not commit a fraud in obtaining premarket approval from the FDA, and Medinol may not argue that BSC committed a fraud.

### D. The March 3, 1997 Release and the Knopf Affidavit

On February 26, 1997, in connection with the resolution of a lawsuit filed against Medinol by then-shareholder Benad Goldwasser, BSC agreed to purchase Goldwasser's shares of Medinol stock. On March 3, 1997, in connection with that purchase, each Medinol shareholder, including BSC, executed a "Shareholder Release and Indemnity Letter" (the "Release"), stating:

> Releasor hereby irrevocably, unconditionally and forever releases, acquits and discharges the Releasees from any and all Claims (as hereinafter defined).

The "Releasor" is BSC, and "Releasees" include Medinol and the Richters. "Claims" are defined as follows:

> [A]ny and all claims (whether civil, criminal or of any other nature), demands, actions, causes of action, costs, expenses, suits, damages, debts, liabilities, obligations, liens, security interests, judgments and rights of any kind whatsoever, direct or indirect, known or unknown, absolute or contingent, determined or speculative, at law, in equity or otherwise, that Releasor ever had, now has or hereafter may have or claim to have or succeed to against a Releasee arising from, relating to, or in connection with prior to the date hereof (i) any business or other transactions or arrangements, oral or written, between Releasor and any of the Releasees relating to Medinol, (ii) Medinol or any of its affiliates, (iii) any of the assets or property of Medinol or any of its affiliates, whether tangible or intangible. . . .

On the basis of this Release, Medinol moves for summary judgment on all of BSC's counterclaims arising from events that occurred before its execution date, March 3, 1997.

The individual who signed the Release on behalf of BSC was Lawrence J. Knopf, BSC's Vice President and Assistant General Counsel. In an attempt to limit the effect of this Release, BSC submitted an affidavit sworn to by Knopf, maintaining that the Release was limited to BSC's claims as a shareholder of Medinol arising from the litigation between Medinol and Goldwasser. Medinol moves to strike that affidavit and moves for summary judgment on all of BSC's counterclaims to the extent they are barred by the Release.

The conclusory statement of a party to a contract as to what the party really intended by signing is not helpful, for intent is found from the objective expectations of the promisee, essentially from the language of the contract. The Knopf affidavit, however, may be part of the record for whatever relevance one may give it.

 By its terms, the Release is governed by New York law, and New York law favors the enforcement of valid releases: "An unambiguous release 'should be enforced according to its terms.'" *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 144 (2d Cir.2000) (*quoting Booth v. 3669 Delaware*, 92 N.Y.2d 934, 680 N.Y.S.2d 899, 703 N.E.2d 757, 758 (1998)). The Release here is not only "unambiguous," but its breadth is notable; it reinforces and clarifies that it covers "all claims" with an array of terms. The criteria for setting aside a facially valid release are extremely narrow, particularly when it was negotiated by sophisticated parties with counsel:

> When, as here, a release is signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel, the general rule is that, if the language of the release is clear, ... the intent of the parties [is] indicated by the language employed. When the words of the re-

lease are of general effect the release is to be construed most strongly against the releasor, and the burden is on the releasor to establish that the release should be limited. The traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake, must be established or else the release stands.

*Middle East Banking Co. v. State Street Bank International*, 821 F.2d 897, 907 (2d Cir.1987) (citations omitted). BSC does not allege duress, illegality, fraud, or mutual mistake, and the Release is unquestionably valid. I grant this aspect of Medinol's summary judgment motion. BSC may not sue arising from events occurring before March 3, 1997.

### E. The Indemnification Clause of the Release and the Transaction Agreement

The March 3, 1997 Release contained an indemnification clause, requiring BSC to indemnify the Releasees for all losses and expenses that Releasees may incur "as a result of or arising from a breach of any of the provisions of this Release and Indemnity by Releasor." One of these provisions, Section 3, states that "Releasor hereby forever covenants not to sue, assert any claim against, or otherwise seek any recovery from, any of the Releasees ... in connection with any Claim." Hence, according to the Release, if BSC as a releasing party were to sue Medinol or the Richters as released parties, and if that lawsuit were to constitute a breach of the covenant-not-to-sue clause, BSC would have to indemnify Medinol or the Richters against expenses incurred by them as a result of BSC's lawsuit.

The Transaction Agreement in section 9.03 also contained an indemnification clause. That clause provided:

*BSC Indemnity.* BSC will defend, indemnify and hold Medinol harmless against any and all liabilities, losses, damages, costs or expenses that Medinol may incur as a result of any action brought by any person (other than a current or former stockholder of Medinol) against Medinol arising from Medinol's execution or performance of this Agreement, the Supply Agreement or the Stockholder Agreement; *provided* that BSC will not be so obligated under this Section 9.03 if Medinol's representations and warranties contained in this Agreement shall not have been true and correct as of the date of this Agreement and the date of the First Closing.

Medinol seeks a declaration that both these clauses obligate BSC to indemnify it against the expenses that it incurred as a result of BSC's counterclaims in this litigation. Both parties ask for summary judgment on this point.

The indemnification clause of the Release requires BSC to indemnify Medinol for Medinol's expenses resulting from a breach of the Release, that is, of BSC's covenant not to sue Medinol or the Richters. BSC's counterclaims against Medinol and against the Richters could be such a suit, and, therefore, a breach of the Release, regardless that Medinol sued first, if it is based on events occurring prior to, and not after, March 3, 1997. If a breach, BSC will be obligated to indemnify Medinol and the Richters for the costs and expenses they incurred because of BSC's breach, and not otherwise. However, the issue of such a breach is a side issue, which I will entertain after all other issues are determined.

The indemnification clause in the Transaction Agreement, in contrast to that of the Release, focuses on suits by third parties. It provides that BSC is required to indemnify Medinol against expenses "that Medinol may incur as a result of any action brought by any person (other than a current or former stockholder of Medinol) against Medinol arising from Medinol's execution or performance of this Agreement, the Supply Agreement or the Stockholder Agreement." § 9.03.

 BSC argues that it is "a current or former stockholder of Medinol," not a subject of the indemnification clause of the Transaction Agreement and, therefore, the indemnification clause of the Transaction Agreement does not apply to its claims against Medinol. I agreed. The Transaction Agreement, along with the Supply and Stockholder Agreements, clearly anticipated the possibility of claims and lawsuits between BSC and Medinol, and contained a number of clauses providing with respect to such litigation, including termination provisions, choice of law clauses, forum selection clauses, and jury trial waivers. If, because of an extended interpretation of an indemnification clause, BSC could not sue Medinol, or could do so provided that it pay Medinol for all its recovery and all Medinol's legal fees, the logic and intent of the Transaction Agreement would be nullified.

In *Hooper Associates, Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 549 N.Y.S.2d 365, 548 N.E.2d 903 (1989), Hooper successfully sued for breach of a contract by which AGS agreed to sell it computer equipment and services. Hooper then sought to recover its attorneys' fees, pursuant to the indemnification clause in that agreement. As here, the indemnity clause was broadly written, but other clauses in the contract implied the right of one party to sue the other. The New York Court of Appeals held that "[c]onstruing the indemnification clause as pertaining only to third-party suits affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision

without force and effect." *Id.* 549 N.Y.S.2d at 367, 548 N.E.2d at 905. The Court of Appeals explained that an indemnity clause "must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed," and that "the court should not infer a party's intention to waive the benefit of the rule [against fee-shifting] unless the intention to do so is unmistakably clear." *Id.* Following *Hooper*, I hold that the indemnity clause in the Transaction Agreement was not intended as a cost-shifting obligation.

For the reasons discussed, I grant the portion of BSC's motion that asks for dismissal of Medinol's counterclaim based on the indemnification clause of Transaction Agreement.

### F. Misappropriation, Trade Secret Law and Affirmative Defenses

In October 1995, when Medinol and Boston Scientific entered into their contractual relationships, the parties intended, and their Supply contract provided, that Boston Scientific would market Medinol's NIR stent, that they would collaborate on research and development towards newer and improved stents, and that BSC then would market such stents. Supply Agreement §§ 2.04, 2.10. Pursuant to this commitment, Medinol developed several potential replacements for the NIR, most prominently, the NIRflex, which it allegedly began developing in April 1998 and had finalized by June 1999. BSC also developed several stent designs during the same time period, including the NIR Sine and the NIR Sine II. It appears that the parties determined to focus their efforts on the NIRflex and to abandon work on the NIR Sine II, following a meeting with the Richters in June 1999.

The collaboration between Medinol and Boston Scientific appears to have ended when, on April 21, 2000, James Tobin,

BSC's Chief Executive Officer, revealed the existence of Project Independence to the Richters. The parties sharply dispute the provenance of Boston Scientific's continuing developments. According to BSC, it looked to its own capabilities and to independent sources for further stent developments. One source was an independent company, Guidant Corporation ("Guidant"). On May 16, 2000, BSC executed a Settlement Agreement with Guidant, settling eleven lawsuits between them. As part of the settlement, BSC obtained a non-exclusive license to the "Lau" patent, which formed the basis of Guidant's MultiLink stent. A second source was general scientific knowledge, allegedly arising from statements made in June 2000 by Dr. Jacob Richter in Japan, disclosing the elements of the NIRflex in a presentation to six Japanese physicians, without requiring them to sign confidentiality agreements. BSC contends that when, in July 2000, it began research and development work on what became its Express stent, it did not make use of any secret knowledge it learned from Medinol.

Medinol sharply disputes BSC's contention. Medinol points out that Graig Kveen, BSC's supervising engineer of the Express project, had worked closely with Medinol, more so than any other of BSC's supervising engineers, and had the greatest knowledge of Medinol's stents. Medinol argues that it was not an accident that BSC was able to complete work on the Express so quickly, beginning human testing in early 2001 and submitting a PMA in June 2003. Medinol claims that Kveen had not been able to develop a marketable stent until Medinol taught him the NIRflex, despite years of previous efforts. Yet, in only three weeks following his work with Medinol, Kveen was able to produce the Express stent for BSC. As for Dr. Richter's presentation to his Japanese au-

dience, Medinol argues that the audience was only six people, that they promised confidential treatment, and that BSC made no showing that it either knew about, or gained knowledge indirectly from, Dr. Richter's presentation in developing its improved stents.

Medinol sues BSC, not only for breach of contract, but also for misappropriating Medinol's trade secrets. Amended Compl., Claim Seven, ¶ 54. Medinol alleges that BSC's theft of Medinol's NIRflex design and its use of the core of that design as the basis for the Express stent, constituted both a breach of the Supply Agreement and a tort, giving rise to both contract and tort damages.

BSC moves for summary judgment to dismiss Medinol's claim of misappropriation. BSC contends that the design of the Express stent was based, not on Medinol's NIRflex design but on Guidant's MultiLink, licensed to BSC just two months earlier. BSC presents diagrams and photographs intending to demonstrate the similarity of the Express to the MultiLink and its dissimilarity to the NIR and the NIRflex. Medinol disputes that contention and presents opposing diagrams and photographs; it argues that the design of the NIR and the NIRflex were "revolutionary," and distinguishable from the MultiLink or other stents on the market, and that the similarities to the Express are evident. Indeed, Medinol obtained patent protection for the NIRflex, but could not use that as the basis of suit because BSC's alleged misdeeds occurred prior to January 17, 2002, the date of Medinol's patent application.

I hold that Medinol's claim of misappropriation is legally insufficient, for reasons different from the issue of fact presented by the parties. The comprehensive coverage of the parties' Supply Agreement appears to be inconsistent with an indepen-

dent tort theory of misappropriation of trade secrets. Furthermore, the design of the NIRflex was not protectible as a trade secret. Accordingly, Medinol's Seventh Claim for Relief should be dismissed.

### 1. Remedies Provided by the Supply Agreement

 BSC agreed under the Supply Agreement to "concentrate its Stent business on the development, marketing, distribution and sale" of Medinol stents, "[s]o long as there has not been a material non-acceptance" of Medinol stents in the marketplace. § 3.02(b). BSC agreed also to "cooperate [with Medinol] in the operation of [a] Development Program," § 2.04(a), and to consult with Medinol "in good faith before approving and initiating any new development programs or clinical trials with respect to the coating or covering of Stents." § 2.04(b). If BSC chose to market its own stents, or some other party's stents, in preference to those developed by Medinol, and there had not been "a material non-acceptance of Medinol stents in the marketplace," BSC agreed that it would pay royalties to Medinol at the rate of "20% of the Average Sale Price calculated over the previous calendar quarter multiplied by the total number of Units sold by BSC during such calendar quarter, less the Burdened Costs that Medinol would have incurred had it manufactured such Stents." § 3.02(b).

I have discussed and held earlier in this decision that the question of breach, whether by Medinol or by BSC or by both, presents triable issues of fact. However, regardless who prevails, the comprehensive nature of the contract is likely to be inconsistent with an independent tort claim of misappropriation. *See, e.g., Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.,* 98 F.3d 13 (2d Cir.1996); *Great Earth International Franchising*

*Corp. v. Milks Development, et al.*, 311 F.Supp.2d 419 (S.D.N.Y.2004). I held in *Great Earth* that a fraud claim, "raised in a case that stems from breach of contract, [must] be 'sufficiently distinct from the breach of contract claim'" in order to be legally sufficient. *Id.* at 425 (quoting *Bridgestone/Firestone*, 98 F.3d at 20). In order to be independently viable, the allegedly false and fraudulent misrepresentations must arise from a separate legal duty, or be collateral and extraneous to the terms and conditions of the contract that were allegedly breached, or cause special damages that are not recoverable under the contract. *Id.* Medinol's claim of misappropriation cannot pass these tests.

### 2. Misappropriation and Trade Secret Law

 The law of trade secret misappropriation tries to harmonize sometimes conflicting policy goals: it provides state law protection for novel and unrevealed work, without creating incentives to displace the public disclosure requirements of federal patent protection. In order to prove a case of misappropriation under New York law, a plaintiff must prove "(i) that it possessed a trade secret and (ii) that the defendant used that trade secret in breach of an agreement, a confidential relationship, or duty, or as a result of discovery by improper means." *Hudson Hotels Corp. v. Choice Hotels Int'l,* 995 F.2d 1173, 1176 (2d Cir.1993), *abrogated on other grounds, Nadel v. Play–by–Play Toys & Novelties, Inc.,* 208 F.3d 368 (2d Cir.2000); *see also Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir.1990) (same).

The first step of the analysis is to determine if a trade secret exists. This can be a fact intensive analysis—determining if the potential trade secret is a "formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Ashland Management v. Janien,* 82 N.Y.2d 395, 604 N.Y.S.2d 912, 624 N.E.2d 1007, 1013 (1993) (quoting Restatement (First) of Torts § 757 cmt. b); *Lehman v. Dow Jones & Co.,* 783 F.2d 285 (2d Cir.1986). Or it may be evident from the pleadings or the facts. Thus, a marketed product cannot be protected, not even information that is sold as a product, *Lehman,* 783 F.2d at 298 (evaluation of merger or acquisition candidates), nor ideas or esthetics embodied in a product. *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964).

 The NIRflex, and the blueprint of its design, are not protectible trade secrets. Medinol's complaint is that BSC misappropriated the design embodied in Medinol's NIRflex, and took it for its own product. Second Amended Complaint ¶ 22 ("[D]rawings show that the Express stent copies unique design features of Medinol's revolutionary NIRflex stent...."). Clearly, however, a product design that has been embodied in a product and held out to the public for sale loses whatever secrecy it had and, with that loss, whatever trade secret protection it once may have been entitled to claim. *Hudson Hotels,* 995 F.2d at 1177. This loss of trade secret protection may extend also to designs for products that are intended to be marketed, even before they are marketed. *LinkCo, Inc. v. Fujitsu Ltd.,* 230 F.Supp.2d 492, 498 (S.D.N.Y. 2002). Protection in this case must come from a different source of law: from a contract that provides for protection or from the law of patents.

For this reason also, I hold that Medinol's Seventh Claim for Relief should be

dismissed as it relates to Medinol's NIR-flex, and BSC's Express, stent.

### 3. BSC's Taxol Program and Taxus Stents

Beginning in early 1997, soon after its contractual relationship with Medinol began, BSC manufactured NIR-like stents for its own research and development activities, instead of using NIR stents purchased from Medinol. BSC used a cheaper laser-cut method of manufacture, in preference to Medinol's more expensive and higher quality processing that produced the NIR stents that Medinol sold to BSC and that BSC, in turn, sold to doctors and hospitals. The parties referred to the BSC-manufactured stents as "NIR knock-offs," or "NIRKOs." BSC manufactured approximately 72,000 NIRKOs until it stopped, in mid–2000. Medinol alleges that BSC used the NIRKOs for its Taxol research and development program, and that BSC developed its Taxus stent, a medically-coated and allegedly improved stent, from the NIRKOs. Medinol claims that BSC thereby breached the Supply Agreement, giving rise to royalties and damages, and that it also misappropriated Medinol's trade secrets embodied in the NIR stent, giving it a right to injunctive and other equitable relief.

Both parties move for summary judgment: BSC, to dismiss Medinol's claim of misappropriation; and Medinol, to strike BSC's defenses, and for an injunction preventing BSC's use of information derived from the NIRKOs for any commercial purpose relating to the Taxol program or the Taxus stent.

### a. Medinol's Claim of Misappropriation

As I ruled that Medinol's claim of trade secret misappropriation was legally insufficient with regard to BSC's Express stent,

so I rule with regard to Medinol's similar claim with regard to BSC's Taxol program and its Taxus stent. The copying of a product design, already on the market, cannot give rise to a claim of misappropriation of a trade secret for the reasons, and pursuant to the case precedents, discussed in the previous section. As those cases hold, the design and make-up of a product, already on the market, cannot be protected as a trade secret because, among other reasons, the design and make-up can no longer be secrets. *Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784; *Hudson Hotels*, 995 F.2d at 1177; *Ashland*, 604 N.Y.S.2d 912, 624 N.E.2d at 1013.

NIR stents were marketed in Europe as early as March 1996, well before BSC used NIRKOs to develop the Taxus stent (accepting for this purpose Medinol's allegations). The record is not clear when Medinol filed for patent protection for its NIR stent, or when it received a patent but, apparently, the protection of the patent laws was not available to Medinol against BSC for Medinol does not allege a claim of patent infringement. Medinol's right to protection must be found in its contracts with BSC, particularly the Supply Agreement.

### b. Affirmative Defenses

BSC sets out various affirmative defenses against such contract enforcement. It argues, first, that the Supply Agreement granted it a license to manufacture NIRKOs and to develop the Taxus Stent from Medinol's stents and, second, that Medinol was fully aware that BSC was producing laser-cut replicas of NIR stents, and not only did not object, but participated in the Taxol program and the development of a medically coated stent that became the Taxus stent, thus waiving its rights. Both defenses are without merit and should be stricken.

The Supply Agreement contained two licenses: section 2.02(b), which authorized BSC to "manufacture in accordance with the terms of this Agreement, use, market, distribute and sell Stents manufactured on the Alternative Line," and section 9.02, which licensed to BSC the right "to market, sell and distribute Stents for all medical applications." As I discussed in the portion of this decision relating to Project Independence, the former section permitted BSC to manufacture stents, but only under the conditions applicable to production on the Alternative Line. The latter provision did not authorize BSC to manufacture stents. Accordingly, because BSC's production of laser-cut knock-off NIR stents constituted the "manufacture" of stents and was not undertaken in connection with the Alternative Line, it was not a licensed manufacturing activity pursuant to the Supply Agreement.

But this does not end the analysis of contract rights. As I discussed in relation to the Express stent, the Supply Agreement was a collaborative contract, binding Medinol and Boston Scientific to cooperation with regard to research and development activities and with regard to marketing and selling activities. Medinol was given primacy with regard to the former, and BSC, with regard to the latter, but neither party was to be shut out, and Medinol was required to supply the stents—those in being and those to be developed—that BSC undertook to market and sell. Supply Agreement §§ 2.04, 3.02. If BSC sold its own developed stents in preference to those that Medinol could supply, BSC agreed to pay Medinol a set royalty, unless there first was "a material non-acceptance of Medinol stents in the marketplace." *Id.*, § 3.02(b). Medinol's

collaboration does not constitute a waiver of rights. Waiver also had to be in writing, § 12.09, and there was none so providing.[8]

The parties sharply dispute the relevant facts of contract performance. BSC alleges that Medinol was deficient and delinquent in its supply obligations. Medinol denies that this was so, and alleges that BSC stole Medinol's designs and knowledge. These and other issues will have to be tried to ascertain which of the parties, either or both, breached the contract, and the consequences arising therefrom. The affirmative defenses of license and waiver are stricken.

BSC's Seventh and Eighth affirmative defenses raise the bars of statute of limitations and laches with regard to Medinol's contract, tort and equitable claims. With regard to laches, BSC argues that Medinol's participation in the Taxol program, as described above, caused BSC to believe that it was authorized to make and use NIRKOs for research and development, and that Medinol therefore cannot complain about the Taxus stents.

■■■■■ The bar of laches applies to equitable, not legal, claims.

Laches is an equitable defense that 'bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant.' A party asserting the defense of laches must establish that: (1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay. *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir.1998). Accordingly, laches cannot bar Medinol's claim for damages

---

8. Limitations on waiver are enforceable. N.Y. Gen. Oblig. Law § 15–301; *see also John Street Leasehold LLC v. FDIC*, 196 F.3d 379, 382 (2d Cir.1999); *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir.1990).

for breach of the Supply Agreement in manufacturing knock-off stents and selling Taxus stents, or for torts. However, laches may bar Medinol's claim for injunctive and other equitable relief.

■ The issue of Medinol's knowledge of, and acquiescence in, BSC's use of NIRKOs in the development of the Taxus stent is sharply disputed. BSC points to approximately eight documents that make reference to laser-cut stents, "KOs," and the like, and refers to a conversation in 1997 or 1998 between David Blaeser, the Director of Research and Development at Scimed, a unit of BSC, and Jacob Richter, in which Blaeser asserts that he told Richter that BSC was not receiving the quantity of stents it required for its research and development and intended to fill its needs by manufacturing laser-cut knock-off stents. Blaeser asserts that Richter replied that the knock-offs, since not representative of NIR stents, would not be satisfactory but, according to Blaeser, he did not tell BSC to stop manufacturing or using the knock-offs.

Medinol disputes this evidence. Medinol contends that BSC's documents relate to specific, agreed-to experiments that were unrelated to the Taxus stent. One such experiment related to the manufacture of stents from nitinol, rather than stainless steel; another compared the roundness of etch-fold-and-weld stents with laser-cut stents. Another document, referring to laser-cut stents generally, with no indication that knock-offs were involved, contained a confirmation by BSC that it would be acquiring Medinol-designed stents from Medinol. Richter also denies that he understood, or fairly could have understood, that Blaeser was telling him that BSC had a program of knocking off NIR stents without paying for them. Summary judgment is not appropriate for such material, disputed issues. *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The defense of laches will remain available to the extent that equitable relief may be available.

BSC's Seventh affirmative defense alleges that Medinol's breach of contract claim with respect to NIRKOs is barred by New York's six-year statute of limitations. N.Y. C.P.L.R. § 213(2). BSC began producing NIRKOs in 1996, and Medinol filed this lawsuit in 2001, fewer than six years later. BSC's defense is stricken.

BSC's defense, that Medinol cannot show any damages that flowed from BSC's manufacture of knock-off stents, is also without merit. BSC agreed in § 2.01 of the Supply Agreement "to purchase Stents developed by or for Medinol from Medinol." BSC has not shown any reason why it should not be bound by this clause, to purchase the stents that Medinol manufactured. Clearly, Medinol was damaged at least in the amount of its lost profits. Furthermore, to the extent Medinol is able to prove that it is entitled to royalties from sales of Taxus stents, *see* Supply Agreement § 3.02(b), that form of damages as an alternative also might be possible. It is premature at this point to discuss the scope of potential recovery. It is sufficient to strike the defense, and I so hold.

Accordingly, of the defenses discussed, all are stricken except, possibly and partially, the defense of laches.

For its part, Medinol contends that BSC's sales of the Taxus stents caused damage to Medinol in the marketplace, and it argues that it should be entitled to an injunction of further development and marketing of the Taxus, citing BSC's prevailing argument in *Cook Inc. v. Boston Scientific Corp.,* 2002 WL 31236289 (N.D.Ill. Oct.1, 2002), 2002 U.S. Dist. Lexis 19223, *aff'd as modified,* 333 F.3d 737 (7th Cir.2003). *Cook,* however, is a special

case, and distinguishable. There a patent holder granted competitive licenses to BSC and to Cook to contest for the better application of a patent to the drug, paclitaxel, to develop a method of coating stents with that drug. In breach of the license agreement, Cook engaged another company to help it and, with such collaboration, bettered BSC's development efforts and won the exclusive license to the patent. BSC sought and successfully obtained a permanent injunction against the marketing and sale of Cook's paclitaxel-coated stent, arguing that Cook beat it to the market solely because of its outside collaboration in breach of its contract with the patent holder and BSC. BSC prevailed in its argument that its loss of market share to Cook would be unquantifiable and irreparable. See Cook, 333 F.3d at 743–44, 2002 U.S. Dist. Lexis 19223 at *8–*9, *17–*18; cf. Freedom Holdings, Inc. v. Spitzer, 2004 WL 2035334, at *28–*29 (S.D.N.Y. Sept. 14, 2004), 2004 U.S. Dist. Lexis 18296 at *92–*93 (loss of market share can constitute irreparable harm).

I decline at this stage to rule whether or not to enjoin the further development and marketing of the Taxus if Medinol proves that BSC breached the contract. The defense, whether Medinol knew about such manufacture and should therefore be barred by laches from injunctive relief, may be applicable, as well as the question whether the contractual remedies of royalties and/or damages show an adequate remedy at law to bar equitable relief.

c. The Barry Affidavit

■ In support of its position regarding the use of laser-cut stents in the development of the Taxus, BSC submits the affidavit of Dr. James J. Barry, BSC's Vice President of Corporate Research and Advanced Technology Development. He claims in his affidavit that BSC did not use any NIR knock-off stents in the course of developing the Taxus. BSC listed Barry on its initial disclosures pursuant to Fed. R.Civ.P. 26(a)(1), but it did not include him on its trial witness list. Medinol claims that BSC also failed to comply with other discovery orders dealing with production of documents relevant to the development of the Taxus. Medinol seeks, as a discovery sanction, the exclusion from the record of Barry's affidavit, moving separately in the nature of a motion to strike.

I dealt extensively with this issue, and read the contested portions of the affidavit along with the parties, at oral argument on November 25, 2003. Boston Scientific argues that it submits Barry's testimony now only because Medinol sought an injunction against the Taxus for the first time in its motion papers, without ever mentioning the Taxus in its pleadings or seeking leave to amend its Complaint to include a claim against the Taxus. Boston Scientific is correct on this score, and I deny Medinol's motion and allow the Barry affidavit to be made part of the record. However, to ensure a level playing field and afford both parties an opportunity for full discovery, Medinol will be entitled to take Barry's deposition even though discovery was closed.

4. Peter Nicholas and Lawrence Best

Medinol also asserts misappropriation of trade secrets causes of action against the remaining individual defendants, Peter Nicholas and Lawrence Best. Medinol's claims against these defendants differ slightly from its misappropriation of trade secrets claims against BSC, in that its claims against Nicholas and Best focus on their involvement with Project Independence. Nevertheless, as with BSC's manufacture of knock-off stents, the alleged trade secret underlying this claim is the design of the NIR stent, which was al-

ready public and on the market by the time Project Independence was initiated. The design of the NIR thus cannot constitute a trade secret. *See Hudson Hotels,* 995 F.2d at 1177. Medinol sets forth no other reasons why the trade secret misappropriation claims against Nicholas and Best should be maintained. I therefore dismiss Medinol's misappropriation claims against Nicholas and Best.

### G. RICO and RICO Conspiracy

Medinol asserts causes of action against BSC, Peter Nicholas, and Lawrence Best, under 18 U.S.C. § 1962(c), for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and under 18 U.S.C. § 1962(d), for RICO conspiracy. The factual predicates for these claims revolve around the decision to implement Project Independence. All three defendants move for summary judgment against these causes of action. Because I have dealt extensively above with the facts of Project Independence as they pertain to BSC, I do not reiterate them here. I pause, however, to summarize the facts regarding the involvement of Nicholas and Best in Project Independence.

Nicholas was a co-founder of BSC, and served as its President and Chief Executive Officer from 1979 until March 1999, when James Tobin replaced him in those positions. Nicholas remains the Chairman of the Board of Directors of BSC. Nicholas admits approving BBD in the summer of 1997. In the course of approving BBD, Nicholas chaired meetings at which it was discussed, received presentations, and toured the BSC facility in Ireland where both the Alternative Line and the Project Independence line were established. Further, he signed three Capital Expenditure Request & Authorization forms ("CERAs") approving funding for Project Independence, and he also took steps to hide Project Independence from Medinol. Nicholas explains his actions in the same way that BSC explained Project Independence: they were trying to protect BSC and the contract with Medinol against the asserted unreliability of Medinol's supply of stents to BSC. Medinol alleges that his motive was more sinister.

On January 26, 1999, Bernard Collins, President of BSIL, and Paul LaViolette, Jim Corbett's successor as President of Boston Scientific International, sent a memo to Nicholas requesting additional funding for Project Independence. Nicholas twice declined to approve that funding, realizing that without it, Project Independence would probably run out of funding and grind to a halt.

Best has been BSC's Chief Financial Officer since 1992, sitting on BSC's Executive Committee but not on its Board of Directors. Project Independence was approved by BSC's Executive Committee on July 11, 1997. According to the agenda for that meeting. Best was to present a Financial Review, but Best was in fact on vacation that day and did not attend the meeting. However, Best did attend other meetings where Project Independence was discussed, and he received several documents relating to Project Independence. He also discussed Project Independence with Tobin after Project Independence was revealed to Medinol.

In his role as Chief Financial Officer, it was Best's responsibility to sign CERAs. He signed three CERAs pertaining to Project Independence between September and December 1997. The parties dispute the significance of these signatures. Best claims that he received stacks of CERAs, and his normal procedure was to scan the first page to make sure they contain all the other required signatures, and then to sign them pro forma. Medinol points to several facts which, it argues, demonstrate that

Best paid much closer attention to the CERAs and actively took an interest in these CERAs in particular. Best also claims that he thought that all three of these CERAs were related to the Alternative Line. Medinol disputes that claim.

More broadly, the parties dispute the extent of Nicholas's and Best's involvement and interest in the conversations and documents to which they were privy, and the extent of their actual awareness of Project Independence. In particular, Medinol notes that when Nicholas denied the extent of his involvement, other BSC employees credited him with "selective amnesia" and laughed at the suggestion that he was not deeply involved in Project Independence.

The substantive RICO provision under which Medinol sues, 18 U.S.C. § 1962(c), prohibits the conducting of affairs "through a pattern of racketeering activity":

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).[9] The statute defines both "racketeering activity" and a "pattern of racketeering activity." "Racketeering activity" is defined broadly under 18 U.S.C. § 1961(1) to include a large variety of possible crimes; as it pertains to this case, the definition includes "any act which is indictable under" 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud). 18 U.S.C. § 1961(1)(B). A "pattern of racke-

teering activity," as defined in 18 U.S.C. § 1961(5), "requires at least two acts of racketeering activity" which occur within a ten-year period. Medinol also sues under RICO's conspiracy provision, § 1962(d), which provides, "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Accordingly, a defendant can be held liable for RICO conspiracy only if that defendant conspired to violate the substantive provisions of RICO. *See Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1064 (2d Cir.1996).

In *West Hartford v. Operation Rescue,* 915 F.2d 92, 100 (2d Cir.1990), the Court of Appeals explained that a plaintiff must make two showings in order to state a claim for damages under RICO. First, the plaintiff must allege that the defendant has violated 18 U.S.C. § 1962, the substantive RICO statute. Second, the plaintiff must allege that he was "injured in his business or property by reason of a violation of section 1962." *Id.* at 100. In order make out a valid allegation that the defendant violated § 1962, the plaintiff must allege "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Id.* (quoting *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983)). Medinol alleges that BSC, Nicholas, and Best each committed two or more acts of mail and wire fraud with regard to Project Independence, such as discussing Project Independence over the telephone or sending and receiving through the mail docu-

---

**9.** Individuals may be held liable under these RICO provisions. This is clear from the text of the statute, which applies to "any person employed by or associated with any enter-

prise ..." Courts have uniformly adopted this position. *See, e.g., H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 232–33, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

ments pertaining to Project Independence. According to Medinol, these acts of mail and wire fraud together constituted a "pattern of racketeering activity." The defendants dispute whether they committed fraud, and dispute whether any such fraud, even if committed, could constitute a "pattern of racketeering activity" in violation of § 1962.

The Supreme Court addressed the scope of a "pattern of racketeering activity" in *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Explaining that Congress enacted RICO out of concern for long-term criminal conduct, the Court held that a plaintiff must prove a long-term "continuity of racketeering activity, or its threat. . . . Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.* at 241–42, 109 S.Ct. 2893. The Court ruled further that a plaintiff could show continuity in one of two ways: either closed-ended or open-ended continuity, "referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. 2893. Where actual continuity is not proven, "the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.* at 242, 109 S.Ct. 2893.

The Second Circuit has refined the tests for closed-ended and open-ended continuity. In closed-ended continuity cases, the plaintiff must prove that the predicate acts which violated § 1962 constituted "a series of related predicates extending over a substantial period of time" and "were neither isolated or sporadic." *De Falco v. Bernas*, 244 F.3d 286, 321 (2d Cir.2001) (quoting *H.J., Inc.*, 492 U.S. at 242, 109 S.Ct. 2893, and *GICC Capital Corp. v. Technology Fi-*

*nance Group, Inc.*, 67 F.3d 463, 467 (2d Cir.1995)). *De Falco* explained:

> Since the Supreme Court decided *H.J., Inc.*, this Court has never held a period of less than two years to constitute a "substantial period of time." Although closed-ended continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists.

*Id.* (citing *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir.1999)).

To demonstrate open-ended continuity, *De Falco* held, "the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Id.* at 323 (quoting *Cofacredit*, 187 F.3d at 242). The Court of Appeals instructed that particularly where the defendant's business was primarily legitimate, such cases should look first "to the nature of the predicate acts alleged or to the nature of the enterprise" to determine whether "it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implie[d] a threat of continued criminal activity." *Id.* (quoting *GICC*, 67 F.3d at 466, *Cofacredit*, 187 F.3d at 242).

In *Cofacredit*, the district court found, after a bench trial, that the defendants had engaged in a scheme of factoring fraudulent invoices—that is, submitting fraudulent invoices to plaintiff, which would pay defendants for the right to collect on the invoices at a later date. The district court entered a judgment in favor of plaintiffs,

based in part on a finding that defendants had violated RICO. 187 F.3d at 234–35, 238. The Court of Appeals reversed the RICO finding, holding that the predicate acts which were sufficiently proven did not extend over a sufficiently long period of time to constitute closed-ended continuity, and did not sufficiently threaten continuing violations to constitute open-ended continuity. *Id.* at 243–44. In reaching its conclusion, the Court of Appeals explained that the defendants' activity was "a serious, but discrete and relatively short-lived scheme to defraud a handful of victims," and was not a "regular means by which" defendants conducted their otherwise legitimate business. *Id.* at 244.

In *De Falco,* plaintiffs sought to develop a plot of land partially located in the Town of Delaware, New York, which contained potentially valuable deposits of gravel. Plaintiffs alleged that defendants, including Town of Delaware officials, engaged in various forms of extortion which threatened and ultimately halted the land's development, and gave free sand and gravel from plaintiff's land to the Town. 244 F.3d at 294–300. A jury found for plaintiffs. *Id.* at 303. The Court of Appeals held that the district court had erred in sustaining the RICO cause of action under the theory of closed-ended conspiracy, because all of the predicate acts had occurred within too short a time-span, but affirmed the finding of open-ended conspiracy. *Id.* at 322, 324. In reaching the conclusion that open-ended conspiracy had been satisfied, the Court of Appeals cited specific threats of continued criminal activity, including the increasing demands of one defendant and the statement that "you haven't seen nothing yet." *Id.* at 323–24.

■ Medinol claims that the activities that formed Project Independence constituted the predicate acts of a RICO conspiracy. Nicholas, Best and others at BSC

first authorized Project Independence in July 1997, and Project Independence ceased when Tobin revealed it to Medinol in April 2000. The time frame is thus longer than the two-year minimum which the Second Circuit has applied to find closed-ended continuity. Nevertheless, the fact that the time frame is longer than two years is not dispositive. Other factors, including "the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." *Id.* at 321. These factors are even more significant for a finding of open-ended continuity, where the crucial question is whether racketeering activity predominated in the operation of defendant's business and would likely continue on an ongoing basis. *Id.* at 323–24; *see Cofacredit,* 187 F.3d at 243–44.

Even if the duration of Project Independence surpassed two years, it did not exceed three. For the individual defendants, moreover, the relevant time periods may be even shorter. It is arguable that Nicholas's participation in furthering Project Independence ended in January 1999, when he refused to authorize the requested expenditure that would have permitted funding for Project Independence to continue. It is also arguable that signing the three CERAs which authorized funding for Project Independence were the only predicate acts committed by Best, and those all took place between September and December 1997. If Nicholas's involvement began in July 1997 and ended in January 1999, and Best's involvement began in September 1997 and ended that same December, neither of those defendants would satisfy the minimum two-year requirement.

■ Open-ended continuity does not require a finding that the predicate acts spanned a certain duration, but it does

require a finding that they are likely to continue into the future, or that they represent the primary way that defendants do business. Neither finding is possible here. Project Independence was disclosed to Medinol in April 2000, has not been revived in more than four years since then, and indeed could not be revived in the future because the relationship between the parties has been terminated. It thus cannot continue into the future. And there are no facts on the record—even if Project Independence was as heinous as Medinol alleges—which would suggest that BSC's regular way of doing business is through fraudulent acts that constitute racketeering activity, or that criminal behavior similar to that alleged with regard to Project Independence will soon recur.

■ I hold that the alleged predicate acts did not satisfy closed-ended or open-ended continuity, and that BSC, Nicholas and Best did not engage in a "pattern of racketeering activity." While I leave open the question whether they committed the requisite predicate acts of mail and wire fraud, their actions did not constitute the "pattern" that RICO requires. The alleged "pattern" was aimed at one victim, Medinol. It had one alleged purpose: undercutting Medinol's position under the Supply Agreement. The number of participants in the alleged scheme was limited; even if BSC, Nicholas, and Best are each counted separately, Medinol has identified only the three of them as participants. "Courts have uniformly and consistently held that schemes involving a single, narrow purpose and one or few participants directed towards a single victim do not satisfy the RICO requirement of a closed or open pattern of continuity." *Lefkowitz v. Bank of New York*, 2003 WL 22480049, at *8 (S.D.N.Y. Oct. 31, 2003), 2003 U.S. Dist. Lexis 19520, at *26–*27; *see also Jerome M. Sobel & Co. v. Fleck*, 2003 WL

22839799, at *12 (S.D.N.Y. Dec. 1, 2003), 2003 U.S. Dist. Lexis 21362, at *36 ("[T]he lack of variety among the predicate acts, the presence of only one scheme with a narrow goal, the small number of participants and the presence of only one victim . . . far outweigh the duration of the fraudulent conduct."). Even if Project Independence was a fraudulent scheme whose participants used the mails and telephone wires in accomplishing their ends, it is not the "pattern of racketeering activity" intended by § 1962(c). Accordingly, I find for defendants on this aspect of their motions for summary judgment.

■ As noted above, if a substantive RICO claim fails, then the RICO conspiracy claim must fail as well. *See Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir.1996) ("Any claim under § 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.") (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir.1993)). Even viewing the law more favorably to Medinol, where the substantive RICO count fails, the plaintiff must show that the predicate acts which have been shown, along with any "additional predicate acts that, if committed, would have displayed continuity sufficient to establish a pattern of racketeering activity," demonstrate "the existence of an agreement to violate RICO's substantive provisions." *Cofacredit*, 187 F.3d at 244. Medinol makes no such showing. Accordingly, I grant summary judgment against both Medinol's substantive RICO claims and its RICO conspiracy claims, and I dismiss Counts X and XI of Medinol's Second Amended Complaint.

### H. Appointing a Director to Medinol's Board

The Supply Agreement, the Transaction Agreement, and the Stockholder Agree-

ment were all executed on October 25, 1995. On that day, pursuant to the Transaction Agreement, BSC invested $40 million in Medinol in exchange for approximately 11.5% of its outstanding stock. The parties also agreed to a second purchase of stock at a later, unspecified time, which they termed the purchase of "Additional Shares." Transaction Agreement § 2.03.

Sixteen months later, on February 26, 1997, for a price of $20.5 million, BSC purchased more shares of Medinol—all those held by Benad Goldwasser, resolving his then-pending litigation with Medinol and the Richters. BSC re-sold roughly 32% of those shares to the Richters (either directly or indirectly to a corporate holding of the Richters', Zuli Holdings). As a result, BSC owned approximately 20% of Medinol, and it has maintained its ownership throughout this lawsuit. Approximately 64% of Medinol's shares are held privately by the Richters, either directly or indirectly through Zuli Holdings.

Section 2.01(b) of the Stockholder Agreement provides: "Promptly after the purchase by BSC of the Additional Shares, Medinol will, if so requested by BSC, use its best efforts to cause a nominee of BSC to be elected to the Board," and the Richters agreed to vote in favor of such an election. The parties agreed that the February 1997 transaction constituted the purchase of the Additional Shares, thus triggering this clause.

The Complaint in this case was filed on April 5, 2001. By letters dated April 12 and 17, 2001, BSC asked Medinol to convene a shareholders' meeting to appoint a BSC nominee to Medinol's Board. The meeting was convened on June 17, 2001, and BSC nominated Dr. Simcha Sadan. The Richters voted against, and the nomination failed.

BSC first pressed its claim for appointment of a director to Medinol's Board before an Israeli court, which ruled that the instant action was the proper venue for resolution of that claim. It now presses its claim on summary judgment, revised to demand that an independent director, rather than a director tied to BSC, be appointed.

Because Medinol is an Israeli company, the election and terms and conditions of service of its directors is controlled by Israeli law, in particular, the "Companies Law," passed in 1999, which is the governing Israeli statute. However, the Stockholder Agreement provides that it is to be governed by New York law, and the preliminary question—whether, and under what circumstances, BSC can sue to have the Stockholder Agreement enforced—is thus to be adjudicated under New York law. *Roby v. Corp. of Lloyd's,* 996 F.2d 1353, 1362 (2d Cir.1993) ("[C]hoice of law clauses are presumptively valid where the underlying transaction is fundamentally international in character."); *see The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *Korea Life Ins. Co. v. Morgan Guar. Trust Co. of N.Y.,* 269 F.Supp.2d 424 (S.D.N.Y. 2003).

 Under New York law, "[a]s a general rule, courts must enforce shareholder agreements according to their terms." *In re Penepent Corp.,* 96 N.Y.2d 186, 726 N.Y.S.2d 345, 750 N.E.2d 47 (2001). *Penepent* relied for this proposition on *Gallagher v. Lambert,* 74 N.Y.2d 562, 549 N.Y.S.2d 945, 549 N.E.2d 136 (1989), which held that an agreement among stockholders to repurchase shares was enforceable. The Court of Appeals in *Gallagher* explained that "our holding and rationale rest on the application of fundamental contractual principles to the plain terms in the parties' own ... agreement."

*Id.* at 947, 549 N.E.2d at 138. The Court of Appeals took a similar approach in *Ronnen v. Ajax Electric Motor Corp.,* 88 N.Y.2d 582, 648 N.Y.S.2d 422, 671 N.E.2d 534 (1996), when it enforced a voting agreement between two shareholders of a close corporation; the *Ronnen* Court explained that "the agreement present[s] an issue of pure contract interpretation." *Id.* at 424, 671 N.E.2d at 536. Thus, under New York law, shareholder voting agreements are valid and are to be adjudicated under general principles of contract law.

Two of Medinol's primary objections to specific enforcement of the Stockholder Agreement are essentially standard contract law defenses. First, Medinol asserts that because BSC breached the contract, Medinol is excused from performance. The breach, according to Medinol, was either disclosure of Medinol's confidential information, breaching section 6.06 of the Stockholder Agreement, or the numerous breaches of the Supply Agreement that Medinol has alleged, under the theory that the Supply, Transaction, and Stockholder Agreements should be viewed as an integrated whole. Medinol's second argument is that BSC's demand for appointment of a director breaches its implied contractual covenant of good faith. Medinol draws this inference from the fact that BSC first asserted its right to appoint a director to Medinol's Board one week after the bitter argument between the parties resulted in this lawsuit. BSC, however, argues that as a minority shareholder of Medinol, it has a legitimate interest to protect its investment, even after being sued.

 As a general principle of contract law, a material breach excuses the other party's nonperformance. *Bernard v. Las Americas Communications,* 84 F.3d 103, 108 (2d Cir.1996); *Printers II, Inc. v. Professionals Publishing Inc.,* 784 F.2d 141, 148 (2d Cir.1986); *United States v.*

*Cimino,* 2002 WL 31000001, at *2 (S.D.N.Y. Sept. 4, 2002), 2002 U.S. Dist. Lexis 16583, *7; *Jafari v. Wally Findlay Galleries,* 741 F.Supp. 64, 68 (S.D.N.Y. 1990); Restatement (Second) of Contracts § 237 and cmt. a (1981). Further, a duty of good faith is implied in every contract. *See* N.Y. U.C.C. § 1–203; *M/A–COM Security Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990); *PT Kaltim Prima Coal v. AES Barbers Point, Inc.,* 180 F.Supp.2d 475, 483 (S.D.N.Y.2001); *511 W. 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 746 N.Y.S.2d 131, 773 N.E.2d 496, 500 (2002); *Kirke La Shelle Co. v. Paul Armstrong Co.,* 263 N.Y. 79, 188 N.E. 163, 167 (1933). Medinol argues that BSC's alleged breach of the Supply Agreement also relieves Medinol of its obligations under the Transaction Agreement. However, the parties made not one, but three contracts, and there would appear to be a manifest unfairness in leaving BSC with a substantial minority position in Medinol, without the protection of even an independent director, even if BSC is proved to be responsible for breach of contract. Whether or not BSC actually breached the Supply and Transaction Agreements, and whether or not the Supply, Transaction, and Stockholder Agreements should be read as an integrated whole or severed, *see* Supply Agreement §§ 12.02, 12.03; Transaction Agreement §§ 9.02, 9.04; Stockholder Agreement §§ 6.03, 6.04; *National Union Fire Insurance Co. v. Turtur,* 892 F.2d 199, 204 (2d Cir.1989); *Korea Life,* 269 F.Supp.2d at 444–45; *Rudman v. Cowles Communications,* 30 N.Y.2d 1, 330 N.Y.S.2d 33, 280 N.E.2d 867, 873 (1972), are questions of fact which I should not resolve on summary judgment. Consequently, I deny summary judgment on this issue of an independent director.

## I. IVUS

On March 23, 1999, BSC obtained patent No. 5,885,218. The technology covered by this patent related to a method for stabilizing intravascular ultrasound (IVUS) images. By letter dated July 8, 1999, BSC assigned this patent to Medinol; this assignment was described as "a terrific win for you and well deserved for your hard work." BSC's assignment was complete; it agreed not to exploit the patent without a license from Medinol and to assist Medinol in enforcing its patent rights. In exchange, the letter provided that "Medinol fully releases Boston Scientific from any claim or liability arising from" actions taken related to the IVUS patent.

Nevertheless, in its second and seventh causes of action (for breach of contract and misappropriation of trade secrets), Medinol alleges that BSC's use of its IVUS technology was a breach of contract, a misappropriation of its trade secrets, and a violation of the terms of the Confidentiality and Non–Disclosure Agreements which the parties signed on October 18, 1995. BSC moves for summary judgment, arguing that Medinol has alleged no damages based on this claim and that the parties reached a full business resolution of the issue as reflected in the July 8, 1999 letter delivered to Medinol. Medinol responds that BSC's assignment of the patent to Medinol does not resolve the issue because, by breaching its other agreements through Project Independence, producing knock-offs, and developing the Express, BSC has violated the commitment it made when it assigned the patent, and as such, Medinol's agreement not to sue for misuse of the IVUS technology is no longer enforceable.

By the plain reading of the July 8, 1999 letter, Medinol released all its IVUS-related claims against BSC to that date. Medinol has not put into the record any evidence to raise a triable issue of fact. Nor has Medinol shown any damages stemming from BSC's alleged misuse of its IVUS technology. I therefore grant summary judgment to BSC on Medinol's claims relevant to IVUS.

## J. Medinol's Claims Regarding Its Planned Initial Public Offering and Regarding Civil Conspiracy

BSC moves for summary judgment against Medinol's claim, alleged under Count IV for fraud in Medinol's Second Amended Complaint, that BSC "falsely represent[ed] to Medinol an intent to purchase Medinol so that Medinol would abandon its plans for an IPO." BSC also moves for summary judgment against Count IX of Medinol's Second Amended Complaint, for common law conspiracy. Medinol's opposition papers state that it does not press these claims, essentially defaulting on these aspects of BSC's motion for summary judgment. Accordingly, summary judgment is granted, dismissing these claims.

## K. BSC's Breach of Contract Counterclaims

Three of BSC's six counterclaims are for breach of contract, and Medinol moves for summary judgment on these counterclaims. Medinol asserts seven grounds upon which summary judgment might be granted on various aspects of BSC's breach of contract counterclaims. The seven grounds are generally distinct from one another, and I address each of them in turn.

### 1. Notice of Breach

Medinol asserts that, regardless whether or not it breached any provision of the relevant contracts, BSC cannot allege those breaches because BSC never gave notice to cure, as required by New York

law. Medinol lists twenty-one assertions made by BSC in its counterclaims for which, Medinol claims, BSC either never gave notice or gave notice that was legally insufficient. Further, Medinol asserts that any notice which was not identified during discovery in response to Medinol's interrogatories should now be barred from being submitted as evidence. According to Medinol, all of BSC's breach of contract counterclaims must fail.

 The New York doctrine of election of remedies provides that upon learning of a breach, a party must choose between terminating the contract and continuing performance. *ESPN, Inc. v. Office of Commissioner of Baseball,* 76 F.Supp.2d 383, 387–88 (S.D.N.Y.1999). If a party chooses to continue performance, it must give notice of breach to the other side, or it waives its right to sue the breaching party. *Nakano v. Jamie Sadock, Inc.,* 2000 WL 680365, *6–*7 (S.D.N.Y. May 25, 2000), 2000 U.S. Dist. Lexis 7144, *18; *Alesayi Beverage Corp. v. Canada Dry Corp.,* 947 F.Supp. 658, 667–68 (S.D.N.Y. 1996), *aff'd* 122 F.3d 1055 (2d Cir.1997); *National Westminster Bank v. Ross,* 130 B.R. 656, 675 (S.D.N.Y.1991), *aff'd sub nom, Yaeger v. National Westminster,* 962 F.2d 1 (2d Cir.1992) (calling the rule "well-settled"). Similarly, under N.Y. U.C.C. § 2–607(3)(a), a buyer of goods who accepts delivery "must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Notice need not be expressed in any magical formula such as a lawyer's letter. *See AM Cosmetics Inc. v. Solomon,* 67 F.Supp.2d 312, 318 (S.D.N.Y.1999) ("a party's reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligations under the contract do not necessarily constitute a waiver of the innocent

party's rights in the future ... waivers of rights in contract will not be inferred unless the intent to waive is clear" (citations omitted)). As in *AM Cosmetics,* where notice has not been given in an unequivocal form such as a lawyer's letter, whether or not the notice is legally adequate can often be a factual issue. *See id.*

 Because BSC elected to continue with the contract rather than terminate it, its claims are deemed waived unless it provided notice to Medinol of the alleged breaches. The application of this rule to the present facts, however, is unclear from the record. BSC disputes Medinol's assertions that no notice was given, and the terrain is heavily fact-laden, with disputes arising over numerous individual pieces of evidence and their import. Several examples serve to illustrate the factual nature of these disputes.

BSC's First Counterclaim alleges that Medinol breached the Supply Agreement by failing to establish a second commercial volume production line, as required by section 2.02(a). Medinol argues that BSC did not give adequate notice of this alleged breach, and BSC points to several letters it sent to Medinol regarding this issue. Medinol responds that these letters predated the end of the first quarter of 1997, the deadline the parties had set for performance, so that these letters reflected concerns about anticipated performance rather than notices to cure an existing breach. Further, the parties dispute the meaning of these letters. For instance, a March 21, 1997 letter from Nicholas to the Richters stated that "we agree that we should forego the requirement of a second manufacturing plant in Israel, but that you will create and protect a back-up manufacturing capability elsewhere in the country." BSC interprets "Israel" as meaning "Jerusalem," and interprets the sentence as reinforcing Medinol's obligation to build

a second production line—and as giving Medinol notice that failure to satisfy that obligation would be a breach, even while foregoing any understanding that the second production line be located in Jerusalem. Medinol interprets the sentence as meaning simply that BSC would waive Medinol's obligation to create a second production line.

As another example, BSC's First Counterclaim alleges that Medinol failed to provide adequate supply of stents. Medinol moves for summary judgment on the grounds that BSC failed to give adequate notice of its shortfalls in supply. BSC responds by referencing eight letters in 1996 and seven in 1997 that, it claims, discuss supply problems, along with affidavits from two BSC officials who claim to have had conversations with Medinol on the topic. Medinol responds to each letter in sequence, arguing, for instance, that two of them constituted "adequate (albeit incorrect) notice with respect to Medinol's January 1997 shipments . . . but [did] not constitute notice with respect to any other alleged shortfall"; that one letter was merely a draft agenda for a meeting; that one was overridden by a subsequent and apologetic letter; and that the affidavits are "wholly conclusory and provide no specific information." All of these claims are factual, and the text of the documents is not conclusive in either establishing notice or in failing to do so.

Indeed, the factual nature of this inquiry is compounded by the fact the parties, on this aspect of Medinol's motion, seek examination under a microscope of a small aspect of an ongoing and multifaceted relationship. While specific documents may sufficiently constitute notice of breach, they cannot encapsulate the entirety of the parties' relationship at any given time. The "whole story" in this case is the history of the relationship, including the various alleged breaches, acts of fraud, and responses to acts of aggrievement. This thicket of detail is prototypical of what the Federal Rules of Civil Procedure would consider "genuine issues" of "material fact." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Granting summary judgment on these issues would be inappropriate.

Medinol also asks me to strike from the record many of the documents that BSC relies upon to prove notice, since they were not identified during discovery in response to Medinol's interrogatories. Fed. R.Civ.P. 33(b)(1) requires that interrogatories be answered "fully in writing under oath." However, neither Fed.R.Civ.P. 33(b)(5) nor 37(a)(2)(B) requires that relevant evidence be stricken. Medinol has not shown that it was prejudiced by BSC's delinquent productions or responses. The issue of sanctions may be raised at the conclusion of the trial. I decline to strike BSC's documents, but grant leave to Medinol to raise this issue promptly following trial.

### 2. Supply of Stents

█ BSC alleges that Medinol failed adequately to supply stents in the quantities that BSC ordered and was the first party to breach its obligations to perform under the Supply Agreement. BSC alleges Medinol's breach both as a defense to Medinol's claims that BSC breached the Supply Agreement, and as counterclaims for damages. Medinol seeks summary judgment dismissing these counterclaims and striking the defense because many of the alleged failures predated the March 3, 1997 Release discussed above, because BSC failed to give notice to cure, and because an agreement of the parties dated August 1, 1996 modified the supply requirements.

Section 3.01(a) of the Supply Agreement required BSC to submit purchase orders to Medinol on "regular purchase order forms." It also required BSC to "deliver monthly to Medinol a twelve month Forecast of Stents to be purchased by BSC." BSC committed itself to purchase the number of stents it forecast for the first three months, and at least 80 percent of the stents it forecast for the next three months. Medinol was required to supply stents sufficient to meet these forecasts and up to 125 percent of the sums forecasted for the fourth, fifth and sixth months. Under section 3.01(b), BSC could amend these monthly forecasts, and Medinol would be required to meet the amended forecasts to the extent that the amendments provided for an increase of 125 percent or less of the sums forecast for the fourth, fifth and sixth months.

The relationship between the "regular purchase order forms" and the monthly twelve-month Forecast of Stents is unclear. By the terms of section 3.01, it is unclear whether the purchase order forms were to be the same as the Forecasts, or whether BSC was required to submit two separate forms. In practice, BSC submitted separately both the monthly forecasts and monthly purchase orders. The Supply Agreement is also silent about the terms of the purchase orders: for instance, how far in advance of the month must a regular purchase order be placed? According to Medinol, the parties discussed this question and reached an agreement on August 1, 1996, lengthening the period between placement of the purchase order and delivery of stents. If Medinol is correct, many of the timeliness issues raised by BSC would be mooted.

Medinol bases its assertion of an agreement on a letter dated August 2, 1996 that memorialized a phone conversation of the previous day. The letter was signed by Jim Corbett, President of Boston Scientific International, and was sent to the Richters and to a number of BSC employees. Recognizing that BSC was committed to ordering sums forecast ninety days in advance, as section 3.01(a) provides with regards to the monthly twelve-month forecasts, Corbett stated that "we would like to change the purchase order process," so that on the fifteenth day of a given month, BSC would place its order for the month that is 45 days away rather than the month that is fifteen days away—for instance, on August 15, BSC would place its order for the coming October, rather than for September. Corbett directed, in his letter, that the change "should be executed this month," and noted that the change "requires" an extra purchase order to be submitted that August, to order the stents which would be delivered in October.

BSC argues that this document is not legally effective to modify section 3.01 of the Supply Agreement because, under section 12.09, the Supply Agreement "may be amended . . . only with the written consent of the parties hereto." Further, BSC contends that even if the requirements governing the monthly purchase orders were amended, the requirements governing the monthly twelve-month forecasts were not altered.

To the extent that the August 1, 1996 agreement, and the August 2 letter memorializing it, modified the prior practice of the parties, it is enforceable against either party. Under N.Y. Gen. Oblig. Law § 15–301(1), a contractual amendment must be "in writing and signed by the party against whom enforcement of the change is sought or by his agent." Under section 12.09 of the Supply Agreement, the contract may be amended "with the written consent of the parties hereto." The letter of August 2, 1996 satisfies these criteria, and accordingly, it is valid; it was

signed by BSC, the party to be charged or its agent, Boston Scientific International, and delivered to, and accepted by, Medinol. However, the parties have not sufficiently explained the relationship of the purchase orders to the Forecasts and the reciprocal obligations of the parties with respect to both these forms. Further, the parties still dispute whether Medinol did, in fact, supply stents in the amount that had been required. Accordingly, these questions remain as issues of fact, and I deny summary judgment on this ground. The issue remains for trial, both as a defense and as a counterclaim.

### 3. Medinol's Price Increases

BSC alleges in its counterclaims that Medinol "charged BSC unjustified premiums" in breach of the Supply Agreement. Section 3.02(a) of the Supply Agreement set the price of Medinol stents sold to BSC at $400 per stent until BSC has sold 3000 stents in any one calendar quarter, and afterwards, thirty percent "of the Average Sale Price per Unit sold by BSC during the immediately preceding calendar quarter." BSC alleges that Medinol charged it prices well above these levels in December 1997 and on a number of instances in 1999. According to BSC, Medinol charged these premiums because it was aware that BSC placed the relevant orders under some time pressure and if it refused to pay, it would risk losing its supply of stents and face a serious business loss. According to BSC, its agreements to pay these premiums, including one covering the December 1997 charge and another, dated October 22, 1998, covering future charges, were coerced and constituted contracts of adhesion.

Medinol, moving for summary judgment, interprets the facts differently. According to Medinol, BSC placed the relevant orders far later than it was required to un-der the Supply Agreement. Medinol agreed to manufacture the ordered stents, but because BSC's substantial last-minute orders required Medinol to incur additional production costs, it asked BSC to increase its payments to cover the costs, and BSC agreed in writing to do so. Medinol argues that a business negotiation between two sophisticated and responsible business concerns cannot be a contract of adhesion.

■ I agree that the written agreements by BSC to pay increased prices for its rush orders do not constitute contracts of adhesion. "Typical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change the contract's terms." *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir.1997). Even if BSC is correct that Medinol "used 'high pressure tactics'" in negotiating these prices, *id.* (quoting *Aviall, Inc. v. Ryder Sys., Inc.*, 913 F.Supp. 826, 831 (S.D.N.Y.1996)), the other telltale elements of contracts of adhesion are absent: Medinol used no fraud or deception, BSC was "on notice" of the increased prices, and there was no "gross inequality of bargaining power" between BSC and Medinol. *Id.* at 168–69 (quoting *Aviall*, 913 F.Supp. at 831, and citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593–95, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991)). The written agreements between Medinol and BSC do not meet the description of contracts of adhesion.

To the extent that BSC signed agreements to pay increased prices in exchange for placing rush orders, such agreements would satisfy both section 12.09 of the Supply Agreement and N.Y. Gen. Oblig. Law § 15–301, both permitting written and signed amendments. I therefore grant summary judgment to Medinol,

striking BSC's allegations and dismissing its counterclaims based on Medinol's increased prices pursuant to written agreements. If any of Medinol's alleged price increases went beyond these agreements, BSC may identify such, and they may be considered, to the extent justified, as issues for trial among its breach of contract counterclaims. As with issues of notice to cure and BSC's counterclaims regarding Medinol's supply of stents, these alleged breaches will also need to be determined in the broader context of the entire relationship between the parties.

### 4. Investment in a Balloon Expandable Nitinol NIR Stent

In accordance with the Transaction Agreement and on the day of its execution, October 25, 1999, BSC purchased shares of Medinol stock for $40 million. Section 5.02(a)(ii) of the Transaction Agreement required Medinol to invest $25 million of the $40 it received as follows:

$25,000,000 will be invested in Medinol's Stent business, including, without limitation (A) ongoing technological developments relating to the NIR Stent business, (B) development of next generation NIR Stent designs, including a balloon expandable nitinol version of the NIR Stent, (C) process, manufacturing, documentation, and other operational developments and improvements relating to the Stent business, (D) obtaining necessary regulatory approvals in connection with the development, testing, sale and marketing of any Stent, (E) performing clinical evaluations and trials inside and outside of the United States of Medinol's Stent products, (F) obtaining and maintaining proper and appropriate protection of all intellectual property of Medinol relating to its Stent business, and (G) such other activities that are recommended by management of Medinol and are reasonably related to the develop-

ment, manufacture, marketing or sale of Stents. Without limiting the generality of the foregoing, the investment described in clause (i)(A) above shall include the establishment of two automated commercial volume production lines for the manufacture of Medinol's Stents, both of which shall be located at manufacturing facilities owned by Medinol to be selected by Medinol after consultation with BSC.

██ BSC alleges in its counterclaims that Medinol breached subclause (B) of this provision by failing to invest in a balloon expandable nitinol version of the NIR stent. Medinol moves for summary judgment, to dismiss that aspect of BSC's counterclaims. Medinol argues that its obligation to invest was in its "Stent business" and in the numerous aspects of that business, "without limitation," as were "recommended by management of Medinol and are reasonably related to the development, manufacture, marketing or sale of Stents." Section 5.02(a)(ii) did not define the extent, if any, that investments had to be made in each specific area of its stent business, as long as the aggregate $25 million was invested in "Medinol's Stent business."

BSC does not challenge that Medinol invested the $25 million in "Medinol's Stent business." The only part of section 5.02(a)(ii) that provides a category of mandatory investment, and that provides for some form of direction or consent by BSC, is the direction that Medinol include "the establishment of two automated commercial volume production lines for the manufacture of Medinol's Stents." Only with respect to the *location* of such facilities is there a requirement that Medinol consult with BSC. And, significantly, the investment directive for establishing the two lines is "[w]ithout limiting the generality of

the foregoing" as it relates to Medinol's investment of the $25 million it was required to invest in "Medinol's Stent business." [10]

BSC's argument, that Medinol was required to single out for investment a "balloon expandable nitinol version of the NIR Stent" is without merit. I hold that Medinol did not have such a specific obligation under section 5.02(a)(ii) of the Transaction Agreement, and I grant summary judgment to Medinol dismissing this aspect of BSC's counterclaims.

### 5. Interference with the Radius

Before entering into the Supply Agreement, BSC had already developed its own stent, the Radius. Medinol "acknowledge[d]," in section 2.01 of the Supply Agreement, "that BSC ha[d] independent, preexisting Stent technology of its own." Under section 3.02(b) of the Supply Agreement, BSC "agree[d] to concentrate its Stent business on the development, marketing, distribution and sale of NIR Stents and other Stents developed by or for Medinol under this Agreement," as long as there was no "material non-acceptance" of Medinol stents "in the marketplace." [11] BSC was permitted to "sell Stents developed by or for it," but it agreed to pay royalties to Medinol if, "prior to a material non-acceptance" of Medinol stents "in the marketplace," BSC sold its own or other stents where Medinol stents could have been sold. Supply Agreement § 3.02(b). Plainly put, BSC agreed to concentrate its efforts on marketing and distributing the NIR and other Medinol stents. It could continue to sell its Radius stents, but subject to an obligation to pay royalties to

Medinol if the market did not reject Medinol-made stents.

According to BSC, it planned to launch the sale of the Radius in Europe in the summer of 1996, following demands from European doctors. However, it was forced to scale back when Medinol protested and threatened to cut off its supply of NIR stents if BSC followed through with its plans. BSC asserts that Medinol maintained this position through at least 1999, continually opposing BSC's plans to enhance the marketing of the Radius and periodically threatening to reduce its supply of NIR stents as leverage. BSC argues that this behavior breached sections 2.01 and 3.02(b) of the Supply Agreement, along with Medinol's implied covenant of good faith and fair dealing.

Medinol seeks summary judgment against these claims. It argues that it was protecting its right to have BSC "concentrate" on marketing Medinol stents. Medinol argues that its objections did not breach the contract.

■■■ The obligations of the parties with respect to the marketing of the Radius stent must be judged by their obligations to act in good faith with each other. "Under New York law, a covenant of good faith and fair dealing is implied in all contracts. This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising

10. The reference in the final sentence of Section 5.02(a) of the Transaction Agreement to "clause (i)(A) above" should be read to refer to "clause (ii)(A) above."

11. Section 3.02(b) also permitted BSC to concentrate on the development and marketing of stents "for minimally invasive bypass developed in conjunction with Nitinol Medical Technologies, Inc." This term of agreement is irrelevant to the current motion.

that discretion." *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada,* 374 F.3d 158, 169 (2d Cir.2004) (citations omitted).

This factual issue appears not to be ripe for summary judgment. BSC's insistence on launching Radius in Europe, and Medinol's objections to the program, must be taken in the full context of their relationship and on a more complete record than is presently before me. I deny this aspect of Medinol's motion for summary judgment.

### 6. Biorest

Biorest is an Israeli company founded in October 1999 by the Richters, Tamara Sugar, Medinol's Vice President for Finance, Administration and Marketing, and Dr. Elazer Edelman. Those same four individuals continue to constitute the Board of Directors of Biorest and own all or substantially all of its stock. Biorest has one employee, who develops the company's product, a drug to be administered before or after a stent is inserted into the human body. Biorest does not own or develop stent technologies itself, and the drug which it develops is not used—and according to Medinol, medically cannot be used—for coating stents. Medinol does not dispute that it did not disclose the Richters' ownership and directorship interests in Biorest to BSC. Nor does Medinol dispute that Jacob Richter spoke with representatives of competing medical technology companies to encourage interest in Biorest.

BSC alleges, as a counterclaim, that Medinol breached the Supply Agreement by failing to disclose to BSC the activities of Biorest. More specifically, BSC argues that Medinol breached section 2.04, which required the parties "to cooperate in the operation of the Development Program" and to "consult with each other in good faith before approving and initiating any new development programs or clinical trials with respect to the coating or covering of Stents," and section 2.07, which required the parties "to promptly report and disclose to each other all Stent Developments." "Stent Developments" are defined in section 1.01 as "all inventions, ideas and improvements relating to Stents."

According to Medinol, Biorest is an independent company, and its activities impose no obligations upon Medinol. Further, Medinol argues that the research and development of Biorest does not implicate either section 2.04 or section 2.07 of the Supply Agreement. Medinol argues that because the drug developed by Biorest is not used to coat or cover stents, it was not subject to the consultation requirement of section 2.04. And it argues that because the drug does not relate to stents but rather to the procedure for inserting them, the drug does not qualify as a "stent development" under the contract and therefore does not trigger Medinol's obligation to report to BSC under section 2.07.

BSC does not claim that it was entirely unaware of Biorest, nor does it explain how it was harmed by Biorest's activities. I hold that the issues with Biorest do not implicate the Agreements between BSC and Medinol and the Richters. I grant Medinol's motion, dismissing this aspect of BSC's counterclaims.

### 7. Interference with the Taxol Program

BSC alleges as a counterclaim that Medinol breached sections 2.04 and 2.07 of the Supply Agreement by obstructing the drug-coated stent program that ultimately led to the development of the Taxus. According to BSC, it encouraged Medinol to participate in its drug-coated stent research, and Medinol did so until it elected

to cease participating in June 2000. BSC alleges that after it ceased its participation in June 2000, Medinol sent several letters to BSC, one of them addressed also to physicians at the Massachusetts Institute of Technology with whom BSC intended to collaborate, instructing them to cease work on the program because the Supply Agreement did not give BSC the right to conduct clinical trials using the NIR stent.

According to Medinol, BSC not only did not encourage Medinol to participate in the drug-coated stent project, but it refused to share its work with Medinol, in contravention of the Supply Agreement. Medinol denies that its letters to BSC expressing its opinions and contentions constituted interference with BSC's contractual or economic relations.

Medinol also argues that BSC cannot maintain this cause of action because it obstructed Medinol's relevant discovery, by not responding to document demands or correspondence, by submitting an incomplete expert report, and by not disclosing information in response to interrogatories.

I grant Medinol's motion for summary judgment dismissing this counterclaim. Whether or not Medinol was privileged to deny use of stents that it developed follows from the dominant issue of this case, which party—Medinol, or BSC, or both—breached the Supply Agreement, and what should be the consequences of any such breach as provided by that Agreement. In light of my ruling on substance, the procedural motion for sanctions is academic, and I therefore deny it.

### III. Conclusion

For the reasons stated, I grant in part and deny in part both Medinol's and Boston Scientific's motions for summary judgment. I grant the motions of Peter M. Nicholas and Lawrence C. Best for summary judgment, dismissing Medinol's claims against them.

Essentially, this is a breach of contract case. The parties agreed to an extensive collaboration with regard to stent development, their marketing and distribution, and the consequences to follow from breach or early termination. The extensive coverage of the contractual provisions, and the rulings made in this decision, are likely to be inconsistent with any theory of recovery for fraud or other tort. *See, e.g., Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.,* 98 F.3d 13 (2d Cir. 1996); *Great Earth International Franchising Corp. v. Milks Development et al.,* 311 F.Supp.2d 419 (S.D.N.Y.2004).

The parties have strained to enlarge this case, alleging in their complaint and counterclaims many varieties of tort and grandiose estimates of damage. It is unlikely that these claims can succeed, for the same reasons causing me to dismiss the claims and counterclaims raised by their motions for summary judgment. Their further efforts will only increase their expenses, jeopardize their respective bona fides, and encroach on the status of other litigants requiring time to try their cases.

This case needs to be made trial ready, and promptly. The parties shall meet and consult to the end of identifying those allegations in the Second Amended Complaint, Answers and Counterclaims that remain for trial pursuant to this Opinion and Order and the observations made above. The parties shall submit to me, by January 6, 2005, a single set of marked pleadings, identifying any allegations that, in the opinion of either, fail to implement my rulings. If either party wishes to explain any points of disagreement, the parties shall do so by presenting their respective views in a single letter.

I shall meet with the parties' counsel to discuss a procedure to negotiate settlement, with or without a mediator, and to set a date for trial and final pre-trial conference. Counsel for the parties shall appear before me for a status conference on January 13, 2005, at 4:00 p.m.

SO ORDERED.